723 P.2d 703

**Sandra LINTHICUM, widow, surviving wife and Personal Representative of the Estate of Jerry Linthicum, deceased, Plaintiff-Appellee,**

v.

**NATIONWIDE LIFE INSURANCE COMPANY, an Ohio corporation, and Dan R. Wagnon and Associates, Inc., an Arizona corporation, Defendants-Appellants.**

**No. 1 CA–CIV 7205.**

Court of Appeals of Arizona, Division 1, Department A.

Dec. 31, 1985.

Hofmann, Salcito, Stevens & Myers, P.A. by Robert D. Myers, Leroy W. Hofmann, Phoenix, for plaintiff-appellee.

McCord & Howe by Warren S. McCord, Scottsdale, and Kornblum, Kelly & Herlihy by Guy O. Kornblum, Abigail S. Kelly, San Francisco, Cal., for defendants-appellants.

Streich, Lang, Weeks & Cardon, P.A. by Louis A. Stahl, William S. Hawgood, III,

Susan Gaylord Gale, Phoenix, for amici curiae American Council of Life Ins. and Health Ins. Ass'n of America.

## OPINION

BROOKS, Presiding Judge.

Plaintiff-appellee Mrs. Sandra Linthicum (Sandra) brought an action in the superior court against Nationwide Life Insurance Company (Nationwide) and its claims agency Dan R. Wagnon and Associates, Inc. (Wagnon) for breach of contract and for breach of the duty of good faith and fair dealing following Nationwide's denial of benefits under a group health insurance policy.[1] The jury returned a verdict in favor of Sandra and awarded her $14,951.13 in damages for breach of the contract of insurance, $150,000.00 in compensatory damages on the bad faith claim and $2,000,000.00 in punitive damages. The trial court entered judgment in accordance with the verdict and awarded Sandra attorney's fees in the sum of $76,000.00 pursuant to A.R.S. § 12–341.01.[2] Nationwide appealed from this judgment, as well as from the trial court's order denying its Motion for Judgment Notwithstanding the Verdict and Motion for New Trial.

The issues presented on appeal are as follows:

1. Whether the trial court erred in failing to direct a verdict in favor of Nationwide on the contract claim and in denying Nationwide's post-trial motions on this issue.

2. Whether the trial court erred in failing to direct a verdict in favor of Nationwide on the issue of "bad faith" and in denying Nationwide's post-trial motions on that issue.

3. Whether the trial court erred in permitting the jury to consider Sandra's emotional distress as an element of damage on the "bad faith" claim.

4. Whether the trial court erred in submitting the issue of punitive damages to the jury and in refusing to grant Nationwide's post-trial motions on this issue.

5. Whether the trial court erred in the admission of evidence and in its instructions to the jury.

On appeal from a judgment and order denying a motion for a new trial, we will consider all conflicting evidence in the light most favorable to the appellee and will take as true all competent evidence supporting the judgment. *Home Indemnity Company v. Bush,* 20 Ariz.App. 355, 513 P.2d 145 (1973). The facts, as well as the reasonable inferences to be drawn therefrom, are hereafter stated in a light most favorable to sustaining the verdict of the jury. Additional facts will be discussed as they become relevant to the issues presented.

## FACTS

Sandra obtained medical insurance from Nationwide through a group insurance policy issued to her employer, Arizona Optical Company.[3] Sandra's insurance became effective on April 1, 1980 and included her husband, Jerry, as a dependent. Sandra did not personally receive a certificate of insurance nor a brochure explaining the coverage under the policy. The group policy contained a limitation on payment of claims relating to certain preexisting illnesses:

Eligible expenses do not include any charges incurred ... (7) for an illness for which the Insured Person received medical care or treatment within the 90 days

---

1. Nationwide and Wagnon will be jointly referred to as "Nationwide" except when it may be necessary to differenciate between the two parties.

2. A.R.S. § 12–341.01, in pertinent part, states: A. In any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney's fees....

3. Group employees often obtain coverage through group insurance policies. A single contract called the master policy covers the entire group. The employer is generally the policyholder and the individual group member employees are the insureds. Note, *Group Insurance Brochures and Certificates and the Demise of the Master Policy,* 25 Ariz.L.Rev. 975 (1983).

preceding the effective date of his insurance hereunder.... The term "treatment" includes the taking of any drug prescribed by a physician.

In September, 1979, prior to the issuance of the policy, Jerry had become ill and was hospitalized under the care of his family physician, Dr. James Skinner. A tumor of one of the parathyroid glands was surgically removed from his throat by Dr. Robert A. Brock on September 28, 1979.[4] At that time, Jerry's physicians, and the pathologists reviewing the tissue samples, concluded that the tumor was benign. Since the findings were not absolutely conclusive, however, samples were also sent to the Mayo Clinic in Rochester, Minnesota for review. The Mayo Clinic pathologist confirmed the diagnosis that the tumor was non-cancerous. Following the surgery, which was deemed to be totally successful, Jerry reported monthly to Dr. Skinner solely for the purpose of having his blood tested to monitor any surgically-induced hypocalcemia (low blood calcium) or any reexacerbation of his prior symptoms. Jerry returned to work shortly after the surgery, and resumed his active lifestyle.

During the relevant ninety day period before Sandra's insurance coverage became effective, January through March, 1980, Jerry was seen by Dr. Skinner on three occasions for blood tests. On the third visit, Jerry's blood pressure and blood calcium were slightly elevated, and a blood pressure medication was prescribed.[5] During this time period, Jerry also received treatment for a shoulder injury which was not healing properly.

In June, 1980, after the insurance coverage at issue became effective, Jerry became acutely ill and was hospitalized in Phoenix and then transferred to a Los Angeles hospital. Sandra presented the Nationwide policy number and wallet card to the hospitals as part of the insurance information requested.

On July 11, 1980, Dr. Leonard Rosoff performed surgery in Los Angeles and discovered an extensive metastatic carcinoma (cancer) of Jerry's parathyroid glands. Dr. Rosoff removed the entire thyroid gland and the remaining three parathyroid glands. He was unable to remove the entire lesion, however, as it had spread throughout the neck and into the chest area.

Dr. Rosoff and Dr. Roger Terry, a Los Angeles pathologist, examined the records and tissues from Jerry's 1979 surgery. These physicians disagreed with the previous diagnosis of a benign tumor and were of the opinion that the tumor discovered in 1979 was also malignant.

The claims for Jerry's June and July, 1980 hospitalizations were submitted to Nationwide by the Phoenix and Los Angeles hospitals. Ms. Georgia Nihoff, Senior Claim Examiner, processed Jerry's claim. Nihoff testified that in accordance with Nationwide's ordinary procedure to be followed when new insureds submit claims, an investigation was initiated to determine if the claim was covered or if payment was excluded by the preexisting illness limitation in the policy.

Mr. Richard Schlade, claims examiner, testified that one of the first bills submitted to Nationwide indicated that the condition for which the bill was incurred may have preexisted the issuance of the policy. The bill, from a radiologist, contained a diagnosis which referred to Jerry's 1979 surgery for "parathyroid adenoma" (a benign tumor). Schlade, communicating with the Linthicums through Arizona Optical, requested the names and addresses of all doctors that Jerry had seen since January 1, 1980, and requested that Jerry and Sandra sign an authorization for Nationwide to obtain medical information.

Upon receipt of the necessary authorization and identification of the treating physicians, Nihoff, Schlade, and other Nation-

---

4. The four parathyroid glands are located within the thyroid gland. These glands secrete parathyroid hormone which controls the amount of calcium that is regulated in the body.

5. Dr. Skinner later testified that this hypertension was unrelated to the parathyroid condition.

wide claim examiners sent inquiries to the doctors who had cared for Jerry after January 1, 1980. These "Dear Doctor" form letters requested information concerning the doctor's contact with the patient, in person or by telephone, the dates of such contact, the patient's symptoms, the doctor's diagnosis, services rendered, medications prescribed and fees charged, as well as any information known concerning treatment by any other physicians. Dr. Skinner, Jerry's treating physician, responded with a short note from his secretary stating that he had moved the location of his practice and that the medical records relating to his treatment of Jerry were in the possession of his former partner, Dr. James Luke. The clear implication of the response was that Dr. Skinner could not provide the detailed information requested by Nationwide without Jerry's medical records. Nationwide then contacted Dr. Luke who claimed that he did not have the records.

One month later, Nihoff sent the same form letter to Dr. Skinner "for reconsideration." Dr. Skinner again indicated that Dr. Luke had Jerry's medical records, but stated that he realized that Jerry's case was "complicated." He emphasized that Nationwide should call him if it had any questions. Nihoff subsequently sent one of the form letters to Dr. Luke, indicating again that she had been advised that Dr. Luke had Dr. Skinner's records. Dr. Luke's response contained the dates, code numbers, diagnosis, medications and charges for Jerry's visits. This report indicated that Jerry was receiving follow up care from his 1979 surgery.[6]

Dr. Leonard Rosoff, Jerry's physician in Los Angeles, also received an inquiry from Nationwide. Dr. Rosoff responded that Jerry had parathyroid carcinoma, but that Jerry's previous physicians were unaware of this diagnosis prior to July, 1980. Dr. Rosoff included the discharge summaries prepared by himself and Dr. Bruce Larson, an endocrinologist.

Nihoff also requested the admitting records and final discharge summary from Jerry's 1979 hospitalization and surgery. In these records, Drs. Skinner, Vericolli and Brock all concluded that Jerry's 1979 parathyroid tumor was benign. The confirmation of this diagnosis by the pathologist from the Mayo Clinic, however, was not included in the Nationwide file. Nihoff also reviewed the hospital records from Jerry's June, 1980 hospitalization in Phoenix and his July, 1980 hospitalization in Los Angeles. The Los Angeles hospital's report indicated that Dr. Rosoff had reviewed the samples from Jerry's 1979 operation, and noted his opinion that Jerry had cancer of the parathyroid glands at that time also.

Nihoff made the final determination to deny Jerry's claim. She stated that her basis for denying coverage was that Jerry had been receiving treatment for cancer during the ninety day exclusionary period even though it was undiagnosed at that time. Nihoff stated that the "treatment" received by Jerry consisted of office visits and laboratory work. She testified that her definition of "treatment" would include simply going to a doctor's office and talking with him, or tests performed by a physician.

On October 20, 1980, Nihoff sent a letter to Arizona Optical denying Jerry's claim. The letter stated that the reason for denial was that Jerry "was treated for this illness within 90 days of the effective date of coverage." The letter further stated that a review of this decision was available upon request. Sandra had terminated her employment at Arizona Optical on September 5, 1980, a fact known to Nationwide, and she did not receive a copy of this denial letter. On October 28, 1980, Jerry was again hospitalized. At this time Sandra learned that the bill for the June 1980 hospitalization had not been paid, and she was required to tender a deposit. Sandra

---

**6.** The location of the medical records was never firmly established although Dr. Luke's report to Nationwide was based upon source documents of some nature. In this regard, Dr. Luke had not personally treated Jerry and this fact was known to Nationwide.

telephoned Nationwide and was informed for the first time that the claim had been denied because of a preexisting condition.

Jerry was subsequently hospitalized as a charity patient, and received out-patient treatment between hospital stays. Sandra, other family members, and friends administered medications and cared for him until his death in February, 1982.

Rick Schlade, a Nationwide agent, was asked to review the claims file in April, 1981 as part of a review process that was initiated solely by reason of an inquiry received from a Phoenix newspaper. Schlade also concluded that the claim was not payable because Jerry had received medical care within the ninety days prior to the effective date of his insurance. Schlade was persuaded by Dr. Rosoff's opinion that Jerry had also been suffering from cancer in 1979. Schlade testified that although the Mayo Clinic pathologist's report was not in the file, it was referred to and quoted in Dr. Rosoff's report, which was part of the file. Dr. Rosoff's conclusion that Jerry had cancer of the parathyroid in 1979 conflicted with this earlier Mayo Clinic pathologist's report, and this conflict was discussed in Dr. Rosoff's report. Schlade also testified that Dr. Bruce Larson's discharge statement indicated that hypercalcemia and hypertension were "secondary" or caused by parathyroid carcinoma. It was on the basis of this report that Schlade drew a causational link between Jerry's parathyroid cancer, and his hypercalcemia and hypertension. Schlade concluded that Jerry had parathyroid cancer and that medical care or treatment was rendered for it or a symptom caused by it during the relevant ninety day period.

Mary Beth Miller, the supervisor of the claims department, conducted an independent review after Schlade's review. Miller came to the same conclusions as Schlade and Nihoff. Miller testified that the reports indicated that Jerry was being treated for hypertension and hypercalcemia during the ninety day period. She relied on Dr. Larson's report that these were due to parathyroid carcinoma. Since Jerry was undergoing tests and post-operative care during the relevant ninety day period, she concluded that he was receiving medical care or treatment for cancer or a symptom of cancer during that time. Miller also concluded that the denial was justified. However, Mrs. Miller indicated some uncertainty in her conclusion and wanted the assurances of the home office. Therefore, the file was sent to Mr. Richard Kokesh, Group Field Services Manager for Nationwide.

Kokesh testified that he placed great weight on the opinions of Drs. Rosoff and Terry that Jerry had cancer in 1979. From this, as well as other reports in the file, Kokesh concluded that Jerry had cancer prior to the effective date and that treatment for cancer continued prior to and after coverage became effective and all the related illnesses were caused by or related to that cancer. The file which Kokesh reviewed did not contain the pathologist reports from 1979 which stated that the tumor was benign. Kokesh concluded that Jerry's claim was handled properly and in accordance with Nationwide's policies.

## THE CLAIM FOR BREACH OF CONTRACT

Nationwide first argues that the trial court erred in failing to direct a verdict in its favor on the coverage issue and in denying its post-trial motions when the evidence established that Jerry had received medical care related to cancer during the exclusionary period.

We begin by noting that the trial court correctly instructed the jury that Nationwide bore the burden of proof on the exclusion issue. *See Hartford Accident and Indemnity Co. v. Villasenor*, 21 Ariz. App. 206, 517 P.2d 1099 (1974); *Pacific Indemnity Co. v. Kohlhase*, 9 Ariz.App. 595, 455 P.2d 277 (1969). Further, where language in an insurance policy is subject to more than one interpretation, the ambiguity must be construed in favor of the insured and against the insurance company that drafted it. *Thompson v. Government Employees Ins. Co.*, 122 Ariz. 18, 592 P.2d

1284 (App.1979). In determining whether an ambiguity exists, the language is to be examined from the viewpoint of someone untrained in law or business. *Sparks v. Republic National Life Ins.*, 132 Ariz. 529, 647 P.2d 1127, *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982).

■ Nationwide's interpretation of the policy exclusion, as it applies to the facts of this case, can be summarized as follows: the parathyroid tumor which was removed and found to be benign in September, 1979 was, in retrospect, a malignancy. Therefore, any post-operative care or treatment that Jerry received following that surgery was, necessarily, related to parathyroid cancer even though cancer had not been diagnosed at that time. Finally, since Dr. Skinner monitored Jerry post-operatively during the ninety day exclusionary period by taking blood tests and prescribing medication for high blood pressure, Jerry was not covered under the policy for his subsequent treatment for cancer when that condition was ultimately diagnosed.

While having superficial appeal, we find that Nationwide's analysis necessarily requires that the exclusionary clause be construed against the insured. To the contrary, policy exclusions are to be strictly construed against the insurance company. *State Farm Automobile Ins. Co. v. Paynter*, 122 Ariz. 198, 593 P.2d 948 (App.1979); *State Farm Automobile Ins. Co. v. Gibbs*, 139 Ariz. 274, 678 P.2d 459 (App.1983). In that regard, Sandra argues that Jerry was not "ill" during the exclusionary period under the policy because he felt fine, was working full-time and was engaging in athletics on a regular basis. The surgery had been deemed to be totally successful and the post-operative monitoring of Jerry's condition did not constitute "care or treatment." In any event, Sandra contends that Jerry did not receive any care or treatment for cancer during the relevant ninety day period because cancer, if it existed at that time, had not been diagnosed.

First, from an evidentiary standpoint, the jury was clearly justified in finding that any malignancy that might have existed prior to the effective date of the insurance coverage was undiagnosed and untreated. Dr. Skinner, the only physician who was even alleged to have treated Jerry for a parathyroid condition during the exclusionary period, testified as follows:

Q. Dr. Skinner, do you have an opinion as to whether or not during the period January 1, 1980, through April 1, 1980, Mr. Linthicum received any care or treatment for cancer or any symptom of it?

A. I don't believe he was. In my opinion, no, he was not treated for any symptom of cancer.

■ With regard to the construction to be given to the exclusionary clause, the trial court instructed the jury as follows:

You are instructed that as a matter of law under the pre-existing condition exclusion of the contract of insurance between the parties, *Nationwide is not obligated to pay any medical bills* in question *incurred by Jerry Linthicum if, whether diagnosed or not, during the period of 90 days prior to April 1, 1980, Jerry Linthicum, (1) had cancer, and, (2) received medical care or treatment for cancer or a symptom caused by cancer.* In this regard, Defendant has the burden of proving both, (1) that Jerry Linthicum had cancer during this period of time, and, (2) that he received any medical care or treatment for cancer or a symptom caused by cancer.

If you find in favor of Defendant in this regard, you must then return a verdict in favor of Defendant.

(Emphasis added.)

■ With respect to the definition of "medical care or treatment," terms which were undefined in the policy, the jury was instructed:

You are instructed that "medical care or treatment", referring to that rendered by a doctor, *includes examinations and diagnosis, as well as the application of remedies.* Medical treatment also includes the prescribing or taking of any

medication or drug at the direction of a physician.[7]

(Emphasis added.)

We note that the foregoing instructions substantially favored Nationwide's own interpretation of the policy provisions and, if anything, contained broader language than that which, arguably should have been presented. In this regard, the exclusionary clause is loosely drawn and its relevant terms are undefined. The clause is thus subject to more than one interpretation under the facts of this case and has been interpreted by Nationwide in the light most favorable to denying coverage. Nevertheless, the jury resolved the contractual issue against Nationwide.

■ Nationwide argues that even if Jerry was not treated for cancer or a symptom of cancer during the relevant ninety day period, he was nevertheless treated for a "condition caused by cancer" and the jury should have been so instructed. Although it would appear that this is a distinction without a difference since "a symptom of cancer" would also be a "condition caused by cancer," Nationwide was free to argue the facts and the reasonable inferences to the jury in any manner that it chose. We do not, however, find any error in the court's instructions relating to the exclusionary clause and conclude that the jury's verdict was supported by the evidence on this issue.[8]

## THE BAD FAITH CLAIM

Nationwide contends that the trial court erred in permitting the issue of "bad faith" to go to the jury, in permitting recovery for emotional distress, and in refusing to grant a new trial or judgment notwithstanding the verdict when the evidence demonstrat-

ed a substantial basis for Nationwide's actions in denying the claim.

Arizona first recognized tort liability for an insurance company's unreasonable denial of coverage in *Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866 (1981). The *Noble* court adopted the definition of "bad faith" expressed in *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978):

To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying the benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. 271 N.W.2d at 376–377.

■ As pointed out by our supreme court in *Noble*, an insurance company may still challenge claims which are "fairly debatable." The tort of bad faith only arises when the insurance company intentionally denies or fails to process or pay a claim without a reasonable basis for such action. In applying this standard, however, it is necessary to determine whether a claim was properly investigated and whether the results of that investigation were reasonably reviewed and evaluated. *Anderson v. Continental Ins. Co., supra*, 271 N.W.2d at 377.

■ Nationwide first argues that since the trial court was unable to grant a directed verdict in favor of Sandra on the contract issue, the claim was "fairly debatable" as a matter of law. In other words, since there was a genuine issue of law or fact with respect to Nationwide's denial of the claim which precluded a directed verdict for Sandra on the contract, Nationwide was entitled to a directed verdict on the issue of bad faith. *See, e.g., National Sav-*

---

7. Nationwide argues that a pretrial ruling that Jerry received medical care or treatment during the ninety day period as a matter of law mandated a jury instruction to that effect. We disagree.

 The doctrine of the law of the case refers to the general rule that a court will not reconsider in the same case a point of law it has already decided. But the rule is one of procedure, not of substance. The court does not lack the pow-

er to change a ruling simply because it ruled on the question at an earlier stage. *Love v. Farmers Ins. Group*, 121 Ariz. 71, 588 P.2d 364 (App. 1978).

8. There is no issue on appeal with respect to the reasonableness of the amount of damages which the jury awarded on the claim for breach of contract.

*ings Life Ins. Co. v. Dutton,* 419 So.2d 1357 (Ala.1982). We decline to follow the "directed verdict test" set forth in *National Savings Life Ins. Co.* In *Fowler v. Great American Ins. Co.,* 124 Ariz. 111, 602 P.2d 492 (App.1979), we rejected the contention that there was any "inconsistency" in submitting both the exclusion and bad faith issues to the jury stating:

> Great American's defense to the contract claim depended on actual proof of arson, whereas the bad faith claim depended on an absence of a reasonable belief by Great American that arson had occurred. The nature of the proofs is sufficiently different so that the failure to prove one would not necessarily mean the failure to prove the other. 124 Ariz. at 113, 602 P.2d at 494.

█ Similarly, Nationwide's defense to the contract in the instant case depended upon proof of care or treatment for an illness during the exclusionary period. On the other hand, the bad faith claim depended upon an absence of a reasonable belief by Nationwide that the claim was excluded from coverage. This issue, in turn, related to whether the claim was properly investigated and whether the results of that investigation were reasonably reviewed and evaluated.[9] Therefore we find no inconsistency in allowing the jury to determine both the contractual issue and the bad faith claim.

█ Nationwide next argues that the evidence demonstrated a substantial basis for Nationwide's denial of the claim and the issue of bad faith should not have been submitted to the jury. We find this to be a close case on this issue. However, considering the evidence and all reasonable inferences in favor of Sandra, we find that the trial court properly submitted the matter to the jury and that the trial court did not err in denying Nationwide's motion for a new trial and motion for judgment notwithstanding the verdict. A judgment notwithstanding the verdict may be granted only when there is no evidence, or reasonable inferences which can be drawn from the evidence, which would support the verdict rendered by the jury. *Huggins v. Deinhard,* 127 Ariz. 358, 621 P.2d 45 (App.1980).

A reasonable insurer conducts a neutral and detached investigation and then determines whether the investigation indicates that the claim is "fairly debatable" such that the payment of benefits may not be its responsibility. *Benke v. Mukwonago-Vernon Mutual Ins. Co.,* 110 Wis.2d 356, 329 N.W.2d 243 (App.1982).

With regard to the investigation conducted by Nationwide, no physician involved in Jerry's care was ever asked whether, during the 90-day period before the effective date of the policy, Jerry had received medical care or treatment for cancer or any symptom of it. The jury could have well concluded that there were at least two missing links in the investigation. First and foremost was Dr. Skinner, the only physician who is even alleged to have treated Jerry for parathyroid problems during the relevant ninety day period. When Dr. Skinner replied to Nationwide's written inquiry by indicating that he could not provide the detailed information requested in the form letter without Jerry's medical records in hand, he invited a phone call or conference pointing out that the case was "complicated." No call or further inquiry from Nationwide was forthcoming, and Dr. Skinner was never asked whether he had provided Jerry with care or treatment for cancer or a symptom thereof. Instead, the investigation was shifted elsewhere in an attempt, the jury could have inferred, to solidify Nationwide's desire to deny coverage. In that regard, the jury could have inferred from Schlade's testimony that Na-

---

9. We note that in *Brown v. Superior Court,* 137 Ariz. 327, 670 P.2d 725 (1983), our supreme court acknowledged that "there are many problems involved in allowing a claimant simultaneously to pursue both a claim under the coverage provided by the policy and a bad-faith claim...." The court went on to state that "one could plausibly argue that the law should not allow such simultaneous actions and that a bad faith claim can be pursued only after disposition of the underlying policy claim." The supreme court's statement was dicta, however, and no rule was established.

tionwide's primary concern was to secure a document from any source, regardless of its accuracy, which would suggest a disclaimer. Ms. Nihoff testified that she denied Jerry's claim for treatment of cancer based on her interpretation of the policy that if an insured had received *any* care or treatment of *any* kind for *any* condition during the three months before the effective date of the policy, the insured would have to go without treatment and without medication for three months before any coverage for treatment of *any* illness would begin.

Nationwide's investigation also failed to include a review by its own medical director, a review which Schlade testified should have been requested. The only outside source of information which Nationwide's claims representatives utilized in their attempt to interpret the complicated and conflicting medical records and reports in this case consisted of a "Merck Manual," several medical dictionaries and a book on anatomy. Although the insurer's belief that the validity of the insured's claim was fairly debatable is a defense to a charge of bad faith, such a belief is a question of fact for the jury. *Sparks v. Republic National Life Ins. Co., supra,* 132 Ariz. at 539, 647 P.2d at 1137.

## DAMAGES FOR EMOTIONAL DISTRESS

█ The jury awarded Sandra $150,000 in damages for her emotional distress. Nationwide argues that since Sandra made no claim for intentional infliction of emotional distress as an independent tort, and there was no evidence of the outrageous conduct necessary to support such a claim, this award of damages should be set aside.

This court recently rejected an identical argument in *Farr v. Transamerica Occidental Life Ins. Co. of Calif.,* 145 Ariz. 1, 699 P.2d 376 (App.1984). We held that damages for emotional distress may be awarded in a "bad faith" case even though the defendant did not intentionally cause

the distress and even though the distress was not severe. Citing *Gruenberg v. Aetna Ins. Co.,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), we concluded that the focus in a "bad faith" litigation is with mental distress resulting from a substantial invasion of property interests of the insured and not with the independent tort of "intentional infliction of emotional distress."

We find no error in the award of damages in the instant case.[10]

## PUNITIVE DAMAGES

Nationwide next contends that the trial court erred in permitting the issue of punitive damages to go to the jury, and also challenges the jury instructions on this issue. In light of recent Arizona caselaw on this issue, we reverse the award of punitive damages.

This court's position on punitive damages in bad faith litigation was articulated in *Farr v. Transamerica, supra.* In *Farr,* we held that before punitive damages are awardable, the evidence must reflect something more than the reckless disregard that is needed to support the bad faith claim. We analyzed several appellate decisions in order to determine the conduct which would be sufficient for an award of punitive damages and included the following: fraud; deliberate, overt and dishonest dealings; oppressive conduct; and insult and personal abuse. We found the following language from *McLaughlin v. Connecticut General Life Ins. Co.,* 565 F.Supp. 434 (N.D.Cal.1983) to be instructive:

> Plaintiffs have offered no evidence which suggests that defendant intended to injure them or that it consciously disregarded the fact that it had no basis for its denial and that its denial would injure plaintiffs. Though the evidence demonstrates that defendant acted cavalierly in handling plaintiffs' claim, it had valid reasons for being disinclined to grant the claim. To allow punitive damages in this

---

**10.** There is no issue on appeal with respect to the reasonableness of the amount of compensa-

tory damages which were awarded by the jury on the bad faith claim.

case would be to hold that everytime an insurer acts unreasonably in denying a claim, its actions give rise to punitive damages. This is not a punitive damage case.

565 F.Supp. at 454. *See also Silberg v. California Life Ins. Co.*, 11 Cal.3d 452, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974). In *Farr*, we concluded by holding that although the insurance company was "bungling and negligent" and should have investigated further, punitive damages were not warranted.

Similarly in the instant case, the jury could have well concluded that Nationwide should have investigated further into Jerry's claim and should have expended greater effort to communicate with the physicians. There was, however, no evidence of actual malice or evil intent or other conduct justifying an award of punitive damages. Much of Sandra's argument in support of the award has reference to alleged procedural errors on the part of Nationwide which do not relate to the claim's decision denying coverage *per se*. Further, certain of the alleged acts of misconduct were specifically approved by Arizona law. For example, the practice of issuing an insurance certificate to summarize the terms and conditions of the policy, and transmitting that certificate to the insured through her employer, is authorized by relevant portions of A.R.S. § 20–1402.

█ Earlier in this opinion, we indicated our belief that this was a "close case" even on the issue of bad faith. We conclude that there was insufficient evidence to submit the issue of punitive damages to the jury.

█ Even if the evidence had been sufficient to support the submission of the punitive damage issue to the jury, we note that the court's instruction was erroneous. The instruction read as follows:

> ... plaintiff has the burden of proving to you that the Defendant/insurer

and/or third party administrator was guilty of conduct shown to be outrageous, willfull and malicious in fact, spitefull, acts which show ill-will toward the Plaintiff, *or acts done with reckless indifference to the rights of the Plaintiff.*

(Emphasis added.)

In *Farr*, we stressed the importance of distinguishing between the evidence required to show bad faith, and that required for punitive damages. "Something more" than reckless disregard is required for punitive damages. As Nationwide correctly argues, the term "reckless disregard," as used in the trial court's bad faith instruction and the term "reckless indifference," as used in the punitive damage instruction are so similar, that the jury might well have erroneously concluded that conduct sufficient for a finding of bad faith would also suffice for a punitive damage award.

## ADMISSION OF EVIDENCE RELATING TO ERISA

Nationwide argues that the trial court erred in admitting evidence of the Employee's Retirement Security Act of 1974, 29 U.S.C. 1001 *et seq.* (ERISA).[11] Prior to trial, Nationwide filed a motion in limine in which it sought to preclude the admission of *any* evidence relating to ERISA's provisions and requirements as well as any reference to Nationwide's alleged failure to comply with such requirements. The motion was based upon the fact that it had never been alleged that Nationwide had violated this federal law in its handling of the Linthicum claim.

Sandra responded to the motion by offering to prove that Nationwide had adopted certain provisions of ERISA as an internal standard of procedure and that Nationwide's failure to comply with its own standard would be relevant evidence on the issue of bad faith. The motion in limine

---

11. ERISA was enacted to protect employees and their beneficiaries by providing minimum standards for employee benefit plans in order to assure the equitable character of such plans and their financial soundness. . 29 U.S.C.A. § 1001(a). ERISA sets forth certain reporting and notification requirements to be satisfied by the provider of such benefits.

was denied by the trial court which properly determined that not *all* reference to ERISA would necessarily be inadmissible.

During trial Sandra offered, as evidence of Nationwide's partial adoption of the ERISA standards, a lesson plan which had been drafted by Nationwide's legal counsel and distributed at a workshop. Nationwide did not object to this offer and itself sought to admit the exhibit but withdrew the offer upon being advised that it was already in evidence.

The lesson plan was prepared and distributed in 1978 in response to ERISA. The plan discussed the requirements for claim denial and review of denied claims, and outlined the procedures to be followed to satisfy these requirements. The plan included a model denial letter and an outline entitled "ERISA good faith outline." The final page of the lesson plan, later admitted in evidence over Nationwide's objection, was a photocopy of § 503 of ERISA.

■ Richard W. Kokesh, group claims manager for Nationwide, testified that he became familiar with ERISA through Nationwide's legal department. Kokesh attended the Nationwide workshop on ERISA and received the lesson plan and outline. According to Kokesh, the purpose of the workshop was to familiarize Nationwide employees with the provisions of ERISA in order that they could adjust their procedure accordingly. Under these circumstances, we hold that there was sufficient foundation for the admission of the entire lesson plan.

■ Nationwide argues that even if the lesson plan itself was properly admitted into evidence, certain testimony regarding the requirements of ERISA, and Nationwide's alleged failure to comply therewith, should have been excluded. Nationwide has failed, however, to direct our attention to any specific portion of the record to which this argument is addressed. *See* Rule 13(a), Arizona Rules of Civil Appellate Procedure. Further, it appears that Nationwide's primary contention on appeal is that Sandra's counsel improperly interpreted and applied the ERISA evidence in his closing argument to the jury. However, in the trial court, Nationwide did not object to opposing counsel's closing argument on this ground or any other ground. Failure to timely object to improper jury arguments constitutes a waiver of such error and grounds for objection not stated to the trial court are waived. *Forquer v. Pinal County,* 22 Ariz.App. 266, 526 P.2d 1064 (1974).

Finally, we find that the trial court did not err in refusing to give Nationwide's requested instructions number 11, 12 and 19 relating to ERISA.

■ Requested instruction 11 stated:

There has been evidence in this case concerning the Employee Retirement Income Security Act of 1974, known as ERISA. You are instructed that a violation of this statute does not constitute bad faith on the part of an insurance company. If you find that Defendant Dan Wagnon's failure to send a letter of denial of coverage directly to Sandra Linthicum was a violation of ERISA, you may consider the fact of the failure to send a letter directly to Sandra Linthicum as evidence of bad faith, or you may find that that fact is not evidence of bad faith. In any event, however, you may not consider any violation of ERISA that you may find as evidence of bad faith.

We find that this instruction is confusing and that it was properly refused on that basis alone.

■ Nationwide's requested instruction number 12 stated that: "the Employee Retirement Income Security Act of 1974 is not the law of this case." We find that this instruction was properly refused as being covered by the trial court's own instruction on "the law of the case." Further, it is a "negative" instruction which could have served to confuse the jury.

Nationwide's requested instruction number 19 advised the jury that they could not consider any violation of ERISA in determining whether punitive damages should be awarded. By reason of our decision to

vacate the award of punitive damages, we find it unnecessary to determine whether or not the trial court erred in failing to give this instruction.

## THE REMAINING ISSUES

With the exception of the trial court's award of attorney's fees, the remaining issues on appeal are directed towards the jury's award of punitive damages. We therefore find it unnecessary to address those issues.

*Attorney's Fees*

There is no issue on appeal with regard to the reasonableness of the amount of attorney's fees awarded to Sandra in the trial court and Nationwide appears to concede that the prevailing party on the contractual issue was entitled to attorney's fees pursuant to A.R.S. § 12–341.01. Having concluded that Sandra properly prevailed on the contractual issue, we therefore affirm the trial court's award of attorney's fees in the sum of $76,000.00. Similarly, Sandra is entitled to an award of attorney's fees incurred on appeal. A statement of the amount claimed shall be filed with supporting affidavits in compliance with Rule 21(c), Arizona Rules of Civil Appellate Procedure, and this court's decision in *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 673 P.2d 927 (App.1983).

## CONCLUSION

In summary, we vacate the award of punitive damages and otherwise affirm the judgment of the trial court.

GREER and JACOBSON, JJ., concur.