723 P.2d 675

Sandra **LINTHICUM**, widow, surviving wife and Personal Representative of the Estate of Jerry Linthicum, deceased, Plaintiff-Appellee,

v.

**NATIONWIDE LIFE INSURANCE CO.**, an Ohio corporation, and Dan R. Wagnon and Associates, Inc., an Arizona corporation, Defendants-Appellants.

No. CV 86–0061–PR.

Supreme Court of Arizona,
In Banc.

July 23, 1986.

Reconsideration Denied Sept. 9, 1986.

Hofmann, Salcito, Stevens & Myers by Robert D. Myers and Leroy W. Hofmann, Phoenix, for plaintiff-appellee.

McCord & Howe by Warren S. McCord, Scottsdale, and Kornblum, Kelly & Herlihy by Guy O. Kornblum and Abigail S. Kelly, San Francisco, Cal., for defendants-appellants.

Streich, Lang, Weeks & Cardon by Louis A. Stahl, William S. Hawgood, II and Susan Gaylord Gale, Phoenix, for amicus curiae American Council of Life Ins. and Health Ins. Assoc. of America.

Langerman, Begam, Lewis and Marks by Amy G. Langerman, Phoenix, for amicus curiae Arizona Trial Lawyers Assoc.

CAMERON, Justice.

This is a petition for review of a decision and opinion of the court of appeals which

affirmed a jury award of compensatory damages for bad faith against Nationwide Life Insurance Company, but reversed the award of two million dollars in punitive damages. *Linthicum v. Nationwide Life Insurance Company*, 150 Ariz. 354, 723 P.2d 703 (1985). We have jurisdiction pursuant to art. 6 § 5(3) of the Arizona Constitution, A.R.S. § 12–120.24 and Rule 23, Ariz.R.Civ.App.P., 17A A.R.S.

We granted oral argument on the petition for review and asked that counsel direct their attention to the following questions:

1. Assuming that indifference to or failure to consider the interests of the insured is sufficient grounds for award of tort damages in a bad faith case, what additional requirement or standard is appropriate to justify an award of punitive damages?

2. Does the evidence in this case meet or fail to meet that standard?

After oral argument we granted the petition for review as to the issue of punitive damages only. We affirm the decision and opinion of the court of appeals as to the other issues considered by that court.

The facts follow. In September 1979, Jerry Linthicum (Jerry) was hospitalized by his family physician, Dr. James Skinner. A tumor on one of his parathyroid glands[1] was surgically removed by Dr. Robert A. Brock on 28 September 1979. At that time, Jerry's physicians, Dr. Skinner and Dr. Brock, plus the pathologist at Phoenix General Hospital, Dr. Voit, determined based upon tissue samples that it was parathyroid *adenoma*, ie. a benign tumor. However, as these tumors can be differently interpreted, some representative slides were sent to the Mayo Clinic for verification. A pathologist at the Mayo Clinic, Dr. Edward Soule, also diagnosed it as parathyroid adenoma. The final diagnosis in the summary addendum of Phoenix General Hospital, prepared by Dr. Vericolli, also states parathyroid adenoma.

Following his surgery, Jerry was required to see Dr. Skinner monthly to have his blood tested for any surgery induced hypocalcemia (low blood calcium) or a reoccurrence of his prior symptoms. He also returned to work, gained twenty-five pounds, and resumed his active lifestyle.

Effective 1 April 1980, Sandra Linthicum (Sandra) obtained medical insurance from Nationwide Life Insurance Company (Nationwide) through a group insurance policy issued to her employer, Arizona Optical Company. The policy was also to include coverage for her husband, Jerry, as a dependent. Sandra never received a copy of this policy, but instead was simply added as a certificate-holder of the policy issued to Arizona Optical Company. Both the group policy and the certificate contained the following limitation as to preexisting illness:

Eligible expenses do not include any charges incurred ... (7) for an illness for which the Insured Person received medical care or treatment within the 90 days preceding the effective date of his insurance hereunder.... The term "treatment" includes the taking of any drug prescribed by a physician.

During the ninety day period prior to Sandra's insurance becoming effective, Dr. Skinner saw Jerry on 16 January, 25 February and 18 March 1980, for blood tests. The March blood test revealed that his blood pressure and calcium level were both slightly elevated (hypertension and hypercalcemia). Dr. Skinner prescribed a blood pressure medication, Enduronyl Forte. Jerry also received treatment from a Dr. Emerson, during February, for a shoulder injury.

On 12 June 1980, Jerry became ill while playing softball. Dr. Skinner had Jerry admitted to Phoenix General Hospital and later transferred him to the Hospital of the Good Samaritan in Los Angeles, California, under the care of Dr. Leonard Rosoff. At both hospitals, Sandra gave the Nationwide

---

1. There are four parathyroid glands located within the thyroid gland. The parathyroid glands secrete a hormone which regulates the amount of calcium in the body.

policy number as part of the requested insurance information.

On 11 July 1980, Dr. Rosoff operated on Jerry and discovered extensive metastatic *carcinoma* (cancer) of the parathyroid glands. Dr. Rosoff removed the entire thyroid gland, including the three remaining parathyroid glands, but he was unable to remove all the cancer as it had spread throughout the neck and into the chest area. Dr. Rosoff and Dr. Roger Terry, a Los Angeles pathologist, examined the records and tissue samples from Jerry's 1979 surgery. They disagreed with the previous diagnosis and concluded that the tumor discovered in 1979 had been malignant and not benign.

The bills from Phoenix General Hospital and the Hospital of the Good Samaritan were submitted to Nationwide. The claim was processed by Ms. Georgia Nihoff, senior claims examiner. Ms. Nihoff testified that she followed Nationwide's normal procedure concerning claims by new insureds and initiated an investigation to determine if the claim was valid or excludable as a preexisting illness. Mr. Richard Schlade, another claims examiner, testified that one of the first bills submitted to Nationwide was from a radiologist and referred to the earlier surgery for parathyroid adenoma. A form letter was sent to Arizona Optical requesting the names and addresses of all doctors that had seen Jerry since 1 January 1980, and further requesting the Linthicums to give authorization for Nationwide to obtain medical information from these doctors. This letter did not state that the medical information sought was part of an investigation concerning whether the claim should be denied as a preexisting illness.

Upon receipt of the authorization and list of doctors, Nationwide sent each physician a "Dear Doctor" letter. These form letters requested information concerning any contact the doctor had with Jerry, either in person or by telephone. The letters also sought: any symptoms Jerry exhibited, diagnosis by the doctor, medications prescribed or services rendered, fees charged and finally any information on treatment rendered by any other doctors.

Dr. Skinner responded to such a letter by stating that he had moved his practice and that all Jerry's medical records were in the possession of his former employer, Dr. Luke. Dr. Luke, however, claimed that he did not have the records. Ms. Nihoff then sent another form letter to Dr. Skinner for "reconsideration". Dr. Skinner again stated that Dr. Luke had the medical records. Dr. Skinner also stated that Jerry's case was "complicated" and that Nationwide should call him if they had any questions. Dr. Luke, in response to a second letter, provided dates, diagnosis, (hyperparathyroidism with hypercalcemia, hypertension), medication and charges for Jerry's monthly office visits during January, February and March 1980. Dr. Luke also indicated that these visits were follow-up care from his 1979 surgery and that Jerry was a patient of Dr. Skinner's during this time, not his.

Dr. Rosoff responded to a similar inquiry from Nationwide. Dr. Rosoff stated that Jerry had parathyroid carcinoma but that his treating physicians did not know this prior to July 1980. He submitted discharge summaries to this effect prepared by himself and Dr. Bruce Larson, an endocrinologist, who also treated Jerry at the Hospital of the Good Samaritan in Los Angeles. At trial, Dr. Skinner testified that, in hindsight, he now believes the tumor removed in 1979 was probably cancerous.

Nationwide also received the admitting records and discharge summaries from Jerry's 1979 surgery at Phoenix General Hospital. These records contained the conclusion that the 1979 parathyroid tumor was benign. However, the confirmation letter from Dr. Soule at the Mayo Clinic concerning the tumor is absent from the Nationwide file.

Ms. Nihoff made the final decision to deny Jerry's claim based upon her determination that he had been receiving treatment for cancer during the ninety day exclusionary period even though the cancer was undiagnosed at that time. Ms. Nihoff testified that the treatment consisted of the

office visits and blood tests. She further stated that it was her understanding of Nationwide policy that treatment could include any contact with a doctor, such as visiting his office or talking with him on the telephone.

On 20 October 1980, a denial letter was sent to Arizona Optical. This letter stated that Jerry's claim was denied because he had received treatment "for this illness" within ninety days of the policy's effective date. It further stated that a review of the denial was possible upon request. The denial letter was sent only to Arizona Optical, as the policyholder, even though Nationwide knew that Sandra Linthicum no longer worked there. Sandra did not receive a copy of this letter and states she was not informed of the denial.

Jerry was hospitalized again at Phoenix General Hospital on 28 October 1980. When Sandra gave the admitting personnel her insurance information, she was informed that Jerry's previous hospital bill had not been paid. Upon telephoning Nationwide from the hospital, Sandra states, she was informed by Ms. Nihoff for the first time that the claim had been denied on the basis of a preexisting illness. Subsequently, Jerry was transferred to Mercy Clinic at St. Joseph's Hospital as a charity patient. From October 1980 until his death in February 1982, Jerry remained a charity patient at Mercy Clinic, receiving out-patient treatment between hospital stays. Dr. Skinner testified that it was his opinion that Jerry eventually became paralyzed due to the delay involved in obtaining treatment through Mercy Clinic. Dr. Skinner felt the paralysis was avoidable, and could have been prevented if Jerry could have afforded private care. Additionally, Sandra, her twelve year old son, other family members, and friends administered medications and cared for Jerry at his home.

After an inquiry by a Phoenix newspaper column, "Answerline", Nationwide reviewed its denial in April 1981. Mr. Richard Schlade, after reviewing the file, concluded that the denial was justified. Mr. Schlade was persuaded by Dr. Rosoff's de-

termination that Jerry had cancer in 1979 and that his previous doctors had misdiagnosed it. Further, Mr. Schlade testified that Dr. Larson's discharge summary indicated that hypercalcemia and hypertension were secondary to or caused by parathyroid carcinoma. From this, Mr. Schlade drew a causational link to the hypercalcemia and hypertension reported in the records of Dr. Luke and determined Jerry had parathyroid cancer and had received treatment for it or a symptom caused by it during the ninety days prior to the effective date of Nationwide's policy.

Later, Ms. Mary Beth Miller, the claims department supervisor, conducted another review of Jerry's claim. She also concluded that Jerry had been treated for cancer or a symptom of it during the ninety day exclusionary period, based upon Dr. Larson's report that hypercalcemia and hypertension are due to parathyroid carcinoma. Ms. Miller, however, showed some uncertainty about this conclusion and therefore, sent the file to the home office, where it was referred to Mr. Richard Kokesh, the Group Filed Services Manager for Nationwide.

Prior to Mr. Kokesh reviewing the file, it was initially examined by his assistant Ms. Pat Tweeton, a senior claims examiner. She wrote on the file:

Rich, I think they did an excellent job on this file. I re-reviewed the whole thing and came to the same conclusion they did.

I feel the claim is preexisting. The problem is, if it is a problem, that the doctors doing the 1979 surgery did not diagnose as cancer. So neither doctor or patient knew this.

\* \* \* \* \* \*

My suggestion would be to stick to denial and advise Wagnon not to discuss with media.

In his review Mr. Kokesh agreed, concluding primarily on the basis of the opinions of Drs. Rosoff and Terry, that the denial was justified.

After Jerry's death, Sandra brought suit against Nationwide and its claim agency, Wagnon, for breach of contract and bad faith. A jury awarded Sandra $14,951.13 for breach of contract, $150,000 for bad faith, and $2,000,000 in punitive damages. The court of appeals reversed the punitive damage award but affirmed on all other issues. We granted review to examine the issue of punitive damages.

## THE STANDARD FOR IMPOSITION OF PUNITIVE DAMAGES

*A. When Punitive Damages May Be Imposed*

■ Exemplary or punitive damages are those damages awarded in excess of full compensation to the victim in order to punish the wrongdoer and to deter others from emulating his conduct. *Cassel v. Schacht,* 140 Ariz. 495, 496, 683 P.2d 294, 295 (1984); Prosser & Keeton, The Law of Torts § 2 at 9 (5th ed. 1984); Dobbs, Handbook on the Law of Remedies § 3.9 at 204 (1973); Restatement (Second) of Torts § 908. Other rationales, besides punishment and deterrence, utilized as justification for punitive damages include preserving the peace, inducing private law enforcement, compensating victims for otherwise unrecoverable losses, and financing the costs of litigation. Ellis, Fairness and Efficiency in the Law of Punitive Damages, 56 So. Cal.L.Rev. 1, 3 (1982).

■ In deciding whether punitive damages are awardable, the inquiry should be focused upon the wrongdoer's mental state. Dobbs, *supra.* To recover punitive damages something more is required over and above the "mere commission of a tort." *Rawlings v. Apodaca,* 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986); Prosser & Keeton, *supra,* § 2 at 9–10. The wrongdoer must be consciously aware of the wrongfulness or harmfulness of his conduct and yet continue to act in the same manner in deliberate contravention to the rights of the victim. *Rawlings v. Apodaca, supra,* 151 Ariz. 162, 163, 726 P.2d at 578–579. It is only when the wrongdoer should be con-

sciously aware of the evil of his actions, of the spitefulness of his motives or that his conduct is so outrageous, oppressive or intolerable in that it creates a substantial risk of tremendous harm to others that the evil mind required for the imposition of punitive damages may be found. *Id.*

This court and the court of appeals have attempted to express and illustrate the type of "evil mind" necessary for punitive damages in many ways and in a myriad of contexts. Unfortunately, this has resulted in an ambiguous, overbroad list of "catch phrases" from which attorneys pick and choose in an effort to obtain punitive damages. The various characterizations of conduct allowing recovery of punitive damages include:

(1) *Malice*—express or implied, *Arizona Publishing Co. v. Harris,* 20 Ariz. 446, 181 P. 373 (1919); *Magma Copper Co. v. Shuster,* 118 Ariz. 151, 575 P.2d 350 (App.1977);

(2) *Spite or ill will, State Farm Mutual Insurance Co. v. St. Joseph's Hospital,* 107 Ariz. 498, 489 P.2d 837 (1971);

(3) *Evil intent or bad motive, Smith v. Chapman,* 115 Ariz. 211, 564 P.2d 900 (1977); *McNelis v. Bruce,* 90 Ariz. 261, 367 P.2d 625 (1962);

(4) *Gross negligence, Gila Water Co. v. Gila Land and Cattle Co.,* 30 Ariz. 569, 249 P. 751 (1926); *Iaeger v. Metcalf,* 11 Ariz. 283, 94 P. 1094 (1908);

(5) *Wanton, reckless or willful acts, Lutfy v. R.D. Roper & Sons Motor Co.,* 57 Ariz. 495, 115 P.2d 161 (1941);

(6) *Intentional misconduct, Id.; Wetzel v. Gulf Oil Corp.,* 455 F.2d 857 (9th Cir.1972);

(7) *Fraud, Jenkins v. Skelton,* 21 Ariz. 663, 192 P. 249 (1920);

(8) *Oppression, Id.; Salt River Water Users' Association v. Giglio,* 113 Ariz. 190, 549 P.2d 162 (1976); *Jerman v. O'Leary,* 145 Ariz. 397, 701 P.2d 1205 (App.1985);

(9) *Extreme, aggravated* or *outrageous conduct, Lerner v. Brettschneider,* 123 Ariz. 152, 598 P.2d 515 (App. 1979);

(10) Conduct involving an *unreasonable risk* of causing distress, *Wetzel v. Gulf Oil Corp., supra.;*

(11) *Reckless disregard* for or *indifference to the rights,* interests or safety of others, *Smith v. Chapman, supra.; Salt River Water Users' Association v. Giglio, supra; Sellinger v. Freeway Mobile Homes Sales, Inc.,* 110 Ariz. 573, 521 P.2d 1119 (1976); *Neilson v. Flashberg,* 101 Ariz. 335, 419 P.2d 514 (1966); *McNelis v. Bruce, supra; Schmidt v. American Leasco,* 139 Ariz. 509, 679 P.2d 532 (App.1983);

(12) *Criminal acts* or conduct, *Puz v. McDonald,* 140 Ariz. 77, 680 P.2d 213 (App.1984);

(13) *Acts done in bad faith, Huggins v. Deinhard,* 127 Ariz. 358, 621 P.2d 45 (App.1980).

The numerous expressions of the conduct and mental state required for punitive damages has broadened its scope but loosened its impact.

> [C]ourts have developed a large vocabulary to describe the kind of mental state required—the defendant must be "malicious", "reckless", "oppressive", "evil", "wicked", or guilty of "wanton misconduct", or "morally culpable" conduct. Since all of these words refer to the same underlying culpable state of mind, and since courts have not been at all concerned with any shades of difference that might be found between, say, malice and recklessness, almost any term that describes misconduct coupled with a bad state of mind will describe the case for punitive damages.

Dobbs, Handbook on the Law of Remedies, § 3.9 at 205. Having juries decide whether to award compensatory vs. punitive damages based on vague verbal distinctions between mere negligence, gross negligence and reckless indifference is often futile and nothing more than semantic jousting by opposing attorneys. Further, it leads to misapplication of the extraordinary civil remedy of punitive damages which should be appropriately restricted to only the most egregious of wrongs. "A standard that allows exemplary awards based upon gross negligence or mere reckless disregard of the circumstances overextends the availability of punitive damages, and dulls the potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct." *Tuttle v. Raymond,* 494 A.2d 1353, 1361 (Me.1985).

We find ourselves in agreement with the Supreme Judicial Court of Maine and "perceive cogent reasons for avoiding an overbroad application of the [punitive damages] doctrine." *Tuttle v. Raymond,* 494 A.2d at 1360. The type of tortious conduct justifying punitive damages should be only those limited classes of consciously malicious or outrageous acts of misconduct where punishment and deterrence is both paramount and likely to be achieved.

■ We, therefore, conclude that a less broad standard for punitive damages is needed. As discussed earlier, it is the "evil mind" that distinguishes action justifying the imposition of punitive damages. *See Rawlings v. Apodaca, supra.* In whatever way the requisite mental state is expressed, the conduct must also be aggravated and outrageous. It is conscious action of a reprehensible character. The key is the wrongdoer's intent to injure the plaintiff or his deliberate interference with the rights of others, consciously disregarding the unjustifiably substantial risk of significant harm to them. *Rawlings v. Apodaca,* 151 Ariz. 161, 726 P.2d at 577. While the necessary "evil mind" may be inferred, it is still this "evil mind" in addition to outwardly aggravated, outrageous, malicious, or fraudulent conduct which is required for punitive damages. We hold that before a jury may award punitive damages there must be evidence of an "evil mind" and aggravated and outrageous conduct.

*B. Burden of Proof For Punitive Damages*

■ In examining the currently broad scope of punitive damages, we reach a re-

lated issue, the burden of proof in a claim for punitive damages. As this remedy is only to be awarded in the most egregious of cases, where there is reprehensible conduct combined with an evil mind over and above that required for commission of a tort, we believe it is appropriate to impose a more stringent standard of proof. When punitive damages are loosely assessed, they become onerous not only to defendants but the public as a whole. Additionally, its deterrent impact is lessened. Therefore, while a plaintiff may collect compensatory damages upon proof by a preponderance of the evidence of his injuries due to the tort of another, we conclude that recovery of punitive damages should be awardable only upon clear and convincing evidence of the defendant's evil mind. *See Tuttle v. Raymond*, 494 A.2d at 1362–1363. In making this distinction, we are not alone. *See e.g. Tuttle v. Raymond, supra; Travelers Indemnity Co. v. Armstrong*, 442 N.E.2d 349 (Ind.1982); *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437 (1980); Or.Rev.Stat. § 30.925 (1981); Minn.Stat. Ann. § 549.20 (1984); *See also* Colo.Rev. Stat. § 13–25–127(2) (1973) (proof beyond a reasonable doubt); Wheeler, *The Constitutional Case for Reforming Punitive Damages Procedures*, 69 Va.L.Rev. 269, 296–298 (1983) (recommending such a higher standard). We hold that the burden of proof for punitive damages is by clear and convincing evidence.

## C. Punitive Damages in Bad Faith Claims

■ In the instant case, we consider whether punitive damages may be awarded in a case involving the tort of bad faith. This question was recently answered by this court in *Rawlings v. Apodaca, supra.* In a bad faith tort case, as with all other torts, punitive damages are not awardable unless there is something more than the conduct required to establish the tort. *Rawlings v. Apodaca*, 151 Ariz. 162, 726 P.2d at 578; *Farr v. Transamerica Occidental Life Insurance Co.*, 145 Ariz. 1, 8, 699 P.2d 376, 384 (1984). However, as we stated in *Rawlings, supra*, punitive dam-

ages are recoverable in a bad faith action when the defendant's conduct is "aggravated, outrageous, malicious or fraudulent" combined with an evil mind as evidenced by a showing that the defendant was consciously aware of the needs and rights of the insured and nevertheless, ignored its obligations. 151 Ariz. 162, 726 P.2d at 578. We hold that punitive damages may be awarded in a bad faith case. *Rawlings, supra.*

## IS THERE SUFFICIENT EVIDENCE TO AWARD PUNITIVE DAMAGES IN THIS CASE?

■ In the case before us, the court of appeals held that the award of punitive damages was not justified. We agree.

While Nationwide may not have dealt with the Linthicums in good faith, there is not sufficient evidence of an evil mind, illustrating a desire to harm consciously disregard the Linthicum's rights, as is necessary to warrant punitive damages. We reach this conclusion irrespective of whether the burden of proof is clear and convincing evidence or the lesser standard of a preponderance of the evidence.

Initially we note, as did the court of appeals, that "certain of the alleged acts of misconduct [by Nationwide] were specifically approved by Arizona law. For example, the practice of issuing an insurance certificate to summarize the terms and conditions of the policy, and transmitting that certificate to the insured through her employer, is authorized by ... A.R.S. § 20–1402." *Linthicum v. Nationwide Life Insurance Company*, 723 P.2d at 714.

Other acts of misconduct alleged by the Linthicums to warrant punitive damages include: sending a denial of claim letter only to Arizona Optical and not to Sandra; not disclosing the medical basis for the denial; investigating all dependent claims filed in the first year of coverage for potential denial; not directly asking any of Jerry's doctors whether he had treated Jerry during the ninety day exclusionary period

before issuing its denial; strictly construing its policy against the insured; conducting only fake reviews of the claim denial after a newspaper inquiry; refusing to provide Sandra with a copy of the policy; knowing the harm a denial would cause the Linthicums and denying the claim anyway. While we do not entirely agree with the court of appeals characterization of these facts as "procedural errors on the part of Nationwide", neither do we find them sufficient to support an award of punitive damages. *Linthicum v. Nationwide Life Ins. Co.*, 723 P.2d at 714.

Admittedly, Nationwide does appear to construe its policy strictly in its own favor. Investigating all dependent claims filed within the first year for potential denial and denying all claims upon any possible supportable basis is definitely not in the insured's interest. These facts are definitely relevant to a claim for bad faith; however, without evidence of an "evil mind" there is not a claim for punitive damages. Nationwide follows a tough claims policy but it is not "aggravated, outrageous, oppressive or fraudulent".

The knowledge of the harm its denial was causing the Linthicums is definitely relevant to proving an "evil mind". If it had been shown that there was a deliberate ignoring of the Linthicums' rights and needs, then punitive damages might have been awardable. In the instant case, Nationwide reviewed the file several times because of the gravity of the situation. While the petitioner may not be satisfied with the procedures utilized in these reviews, they do not appear to be designed to deny valid claims. We do not find sufficient evidence to affirm the punitive damage award.

We reverse and vacate the award for punitive damages and affirm the remainder of the judgment of the trial court and the opinion of the court of appeals.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and FELDMAN, JJ., concur.