213 P.3d 288

**Maria MENDOZA, Plaintiff/Appellant/ Cross–Appellee,**

v.

**McDONALD'S CORPORATION, Defendant/Appellee/ Cross– Appellant.**

**No. 1 CA–CV 07–0903.**

Court of Appeals of Arizona, Division 1, Department E.

July 7, 2009.

142

Friedman Rubin & White By William S. Cummings and Richard H. Friedman and James A. Hertz, Bremerton, WA, and David S. Shughart, P.C. By David S. Shughart, Scottsdale, Co–Counsel for Plaintiff/Appellant/Cross–Appellee.

Brian Cave LLP By Jay A. Zweig, Phoenix, and Gallagher & Kennedy, P.A. By Jeffrey T. Pyburn and Mark A. Fuller, Phoenix, and Paul Hasting Janofsky & Walker LLP By Steven Thomas Catlett, Chicago, IL, Co–Counsel for Defendant/Appellee/Cross–Appellant.

## OPINION

NORRIS, Judge.

¶ 1 This appeal arises out of a judgment entered on a jury verdict in favor of plaintiff-appellant Maria Mendoza and against defendant-appellee McDonald's Corporation on Mendoza's claim McDonald's breached its duty of good faith and fair dealing in handling her workers' compensation claim. On appeal, Mendoza argues the superior court misinstructed the jury on compensatory damages and respondeat superior, and, through certain erroneous evidentiary rulings, caused the jury to deny her claim for punitive damages. In its cross-appeal, McDonald's argues the issue of punitive damages should not have gone to the jury. As we explain below, we agree with Mendoza, disagree with McDonald's, and therefore reverse in part, va-

cate in part, and remand for a new trial on compensatory and punitive damages.

## FACTS AND PROCEDURAL BACKGROUND[1]

### I. Mendoza's Workers' Compensation Claim and Proceedings Before the Industrial Commission of Arizona

¶ 2 On June 3, 1997, Mendoza injured her right arm when she tripped and fell while carrying a box of meat patties while working at a McDonald's restaurant. Three days later, Mendoza informed her manager she was not able to continue working. McDonald's directed Mendoza to obtain treatment at the emergency room at a local hospital. She was eventually referred to an orthopedic surgeon, Thomas E. Roesener, M.D., for further treatment. Dr. Roesener placed Mendoza on a no-work status, and McDonald's accepted Mendoza's workers' compensation claim. As a self-insured employer, McDonald's began paying Mendoza temporary total disability benefits.

¶ 3 Although Dr. Roesener initially believed Mendoza had suffered a strained right elbow and mild damage to her ulnar nerve, he also began to suspect Mendoza had injured her median nerve. In September 1997, based on her pain and on nerve conduction studies performed by another physician, Vito R. Del Deo, M.D., Dr. Roesener concluded Mendoza had injured her median nerve in the accident and was now suffering from carpal tunnel syndrome; he also concluded Mendoza had injured her radial nerve. Although Dr. Roesener believed the radial nerve injury was not then surgical and might resolve over time, he scheduled Mendoza for carpal tunnel surgery and sought McDonald's approval for that procedure. McDonald's, however, refused to approve the requested surgery, misinterpreting Dr. Del Deo's report as indicating Mendoza's carpal tunnel syndrome was not work related. In October 1997, Dr. Roesener advised McDonald's that Dr. Del Deo had not concluded the carpal tunnel syndrome was unrelated to the accident and warned that without surgery Men-

---

1. We view the evidence in the light most favorable to upholding the jury's verdict. *Hutcherson*

*v. City of Phoenix*, 192 Ariz. 51, 53, ¶ 13, 961 P.2d 449, 451 (1998).

doza could experience permanent dysfunction. McDonald's, however, continued to deny authorization for the surgery and, on November 19, 1997, sent Mendoza a notice of claim status denying the carpal tunnel surgery as "not work related" ("November 1997 notice of claim").

¶ 4 Despite its denial, on December 15, 1997, at McDonald's request, an orthopedic surgeon, Ronald B. Joseph, M.D., conducted an independent medical examination of Mendoza. Like Dr. Roesener, Dr. Joseph diagnosed Mendoza as having work-related carpal tunnel syndrome. He recommended at least four weeks of conservative, nonsurgical treatment and opined Mendoza could return to light-duty work, although he did not specify any specific light-duty work restrictions. If the conservative treatment was unsuccessful, he recommended endoscopic carpal tunnel surgery. Dr. Joseph also concluded Mendoza had injured the right radial nerve in the accident and suggested Mendoza might ultimately need radial nerve decompression.

¶ 5 Based on Dr. Joseph's examination, on January 14, 1998, McDonald's sent Mendoza a notice of claim status accepting Mendoza's claim for benefits; however, because Dr. Joseph had opined Mendoza could return to a light-duty status, McDonald's terminated her temporary total disability benefits as of January 13, 1998. Although McDonald's informed Mendoza it could provide light-duty work,[2] Mendoza did not return to work, relying on Dr. Roesener's continuing recommendation that she not do so. Mendoza sent a protest letter to the Industrial Commission of Arizona ("ICA"), which was received on February 5, 1998. The ICA treated Mendoza's letter as a request for a hearing on the denied authorization for carpal tunnel surgery and on McDonald's termination of her temporary total disability benefits. Accordingly, the ICA set a hearing on the issues. Mendoza and McDonald's each retained counsel to handle the ICA proceeding.

¶ 6 In the meantime, Dr. Roesener continued to recommend surgery for Mendoza's carpal tunnel syndrome. He also reiterated his belief she should not return to work before having the surgery.

¶ 7 Mendoza's attorney attempted to persuade McDonald's, through its counsel, to approve the carpal tunnel surgery, but McDonald's refused to do so. Although Jennifer Chargaulaf—the McDonald's employee assigned to handle Mendoza's claim, *see supra* note 2—personally believed, based on Dr. Joseph's examination, that Mendoza's carpal tunnel condition was work related, on advice of counsel, McDonald's took the contrary position in the ICA proceeding. It asserted, first, Mendoza was not entitled to carpal tunnel treatment because she had failed to timely protest the November 1997 notice of claim and, thus, McDonald's refusal to approve carpal tunnel surgery had become final [3]; and second, Mendoza's carpal tunnel condition had not been caused by the accident, despite the opinions provided by Drs. Roesener and Joseph.

¶ 8 In May 1998, McDonald's counsel deposed Mendoza through an interpreter. Before her deposition, Mendoza's attorney provided McDonald's counsel with medical records that disclosed Mendoza had injured her right arm in a 1991 work-related accident. Nevertheless, at her deposition Mendoza stated she had never had a prior problem with or been seen by a doctor for any treatment for her right arm before the accident at McDonald's.[4]

---

**2.** At trial, Jennifer Chargaulaf, the McDonald's employee who handled Mendoza's workers' compensation claim from November 1997 through December 1998, acknowledged McDonald's should have followed up with Dr. Joseph and asked him to specify work restrictions for Mendoza. She also acknowledged that, without knowing this information, McDonald's was not in a position to determine whether it actually had light-duty work available and suitable for Mendoza. Because of this, Chargaulaf admitted McDonald's should not have terminated Mendoza's temporary total disability benefits.

**3.** This argument was without merit. The ICA received Mendoza's protest letter within the protest time established by state statute. *See* Ariz. Rev.Stat. ("A.R.S.") §§ 23–941 (1995), –947 (Supp.2008).

**4.** Mendoza later asserted she had not understood the questions about her right arm. *See infra* ¶ 26.

¶ 9 In late May 1998, after Mendoza's deposition, a hand surgeon, Mitchel A. Lipton, M.D., examined Mendoza at McDonald's request. According to a May 1998 claim file note prepared by Chargaulaf, McDonald's ICA counsel had set this examination "to support our denial." In requesting the examination, McDonald's ICA counsel had advised Dr. Lipton about Mendoza's 1991 industrial injury and informed him McDonald's wanted to know whether he could determine if the carpal tunnel syndrome was work related, given the June 1997 emergency room treatment record did not reflect Mendoza had injured her wrist in the accident and her carpal tunnel symptoms had not been diagnosed until Dr. Del Deo examined her in September 1997. After examining Mendoza, Dr. Lipton reached a "diagnostic impression" she had probable right carpal tunnel syndrome, although he recommended against surgery. He was unable to determine, however, whether Mendoza's carpal tunnel syndrome was related to the accident at McDonald's.[5]

¶ 10 Recognizing the medical evidence that Mendoza's carpal tunnel condition was not work related was "sparse based on [the] Dr. Joseph and Dr. Lipton reports," in July 1998, McDonald's decided to accept Mendoza's carpal tunnel syndrome as being work related, but refused to authorize the surgery Dr. Roesener had recommended. Instead, it insisted Mendoza first participate in the conservative nonsurgical treatment recommended by Dr. Joseph before it would authorize surgery.

¶ 11 Dr. Roesener, however, continued to recommend surgery instead of conservative care, which he believed would not be helpful. He also reported Mendoza was having increasing pain in her right wrist and noted she was beginning to experience symptoms that could represent a right radial nerve entrapment. In an effort to resolve the disputes over conservative care versus surgery and McDonald's termination of temporary total disability benefits, Mendoza's counsel proposed sending Mendoza to a different doctor,[6] who would determine both an appropriate course of treatment and Mendoza's work status. McDonald's refused the offer.

¶ 12 In December 1998, Dr. Joseph, again at McDonald's request, saw Mendoza for another independent medical examination. Dr. Joseph diagnosed persistent right carpal tunnel syndrome, which he described as "severe, chronic," and also "probable right radial nerve entrapment." He recommended endoscopic carpal tunnel surgery, in part because traditional or "classical" carpal tunnel surgery might result in reflex sympathetic dystrophy ("RSD").[7] He nevertheless stated RSD was also a risk even with endoscopic surgery. Based on Dr. Joseph's second examination, McDonald's offered to authorize endoscopic surgery. But, as it turned out, Dr. Roesener, as a matter of practice, did not perform endoscopic carpal tunnel surgery.[8]

¶ 13 In February 1999, Mendoza, through her lawyer, requested McDonald's approve the carpal tunnel surgery, either endoscopic or classical, and agree to treatment by any qualified surgeon, with the exception of Dr. Joseph because he was not her treating phy-

5. Dr. Lipton reported:
 As to whether the carpal tunnel syndrome is related to the industrial injury in question, I am not sure. Based on her history, she contused the right forearm, and it's possible she developed swelling post injury. If her pain threshold were as low right after the injury as it appears to be today, then it is certainly possible she avoided using that upper extremity, leading to continued swelling and pressure on the right median nerve. It certainly does not appear as if there was a direct contusion to the right median nerve, based on the mechanism of injury described to me.

6. Mendoza's counsel proposed sending Mendoza to either Douglas A. Bobb, D.O., or Paul M.

Guidera, M.D., both hand surgeons. Dr. Guidera later examined Mendoza at McDonald's request. See infra ¶¶ 17–19.

7. RSD is "a chronic pain syndrome ... usually affecting an extremity, and characterized by intense burning pain, changes in skin color and texture, increased skin temperature and sensitivity, sweating, and edema." Dorland's Illustrated Medical Dictionary 591, 1851 (31st ed. 2007).

8. At trial, physician-witnesses called by Mendoza and McDonald's testified "classical" or open carpal tunnel surgery, which Dr. Roesener did perform, was a medically acceptable procedure for carpal tunnel syndrome.

sician and would be a material witness in a lawsuit Mendoza planned to file against McDonald's accusing it of bad faith in the administration of her workers' compensation claim. According to Mendoza's attorney, McDonald's did not respond to this proposal because it had decided to "litigate it all the way."

¶ 14 The ICA hearing went forward regarding the compensability of Mendoza's carpal tunnel syndrome, the surgery as recommended by Dr. Roesener, and Mendoza's entitlement to temporary total disability benefits. On April 19, 1999, an ICA administrative law judge concluded Mendoza had sustained an industrial injury on June 3, 1997; the carpal tunnel syndrome was causally related to that injury; and she was, therefore, entitled to the surgery as recommended by Dr. Roesener ("First ALJ Decision"). The administrative law judge found, however, Mendoza was not entitled to temporary total disability benefits after January 13, 1998, because McDonald's had light-duty work available to her. Mendoza appealed the temporary total disability ruling made in the First ALJ Decision and this court set it aside in a memorandum decision issued in June 2000. *Mendoza v. Indus. Comm'n,* 1 CA–IC 99–0113 (Ariz.App. June 6, 2000) (mem.decision).[9]

¶ 15 Based on the First ALJ Decision, McDonald's approved Dr. Roesener's surgery, and he operated on Mendoza on May 28, 1999. Although the surgery was deemed technically successful in decompressing the carpal tunnel, Mendoza continued to experience pain and other difficulties, and Dr. Roesener was unwilling to release her to return to work. McDonald's responded by seeking a second independent medical examination from Dr. Lipton. Dr. Lipton saw Mendoza in October 1999 and reported Mendoza's medical condition was not stationary and she had "definite objective findings at this time." He advised against Mendoza using her "right upper extremity" and recommended she be seen by a hand surgeon.

¶ 16 In March 2000, Leonard S. Bodell, M.D., a hand surgeon, began to treat Mendoza. He diagnosed Mendoza as suffering from a chronic pain syndrome, which he described as "centrally mediated pain." Dr. Bodell attempted to treat Mendoza's condition nonsurgically and requested McDonald's approval to refer Mendoza to other health care providers to assess and assist in treating her pain problems.

¶ 17 McDonald's refused to approve the requested referrals and instead scheduled Mendoza to be examined by yet another hand surgeon, Paul M. Guidera, M.D. In May 2001, Dr. Guidera saw Mendoza, who was accompanied by her daughter acting as her interpreter.[10] Dr. Guidera concluded Mendoza was not medically stationary and diagnosed possible persistent radial tunnel syndrome, which he related to the industrial injury. Dr. Guidera also recommended, as had Dr. Bodell, that Mendoza be seen by other specialists to assess and treat her continuing pain problems. After reviewing Dr. Guidera's report and reexamining Mendoza in June 2001, Dr. Bodell reported he concurred with the "essential features" of Dr. Guidera's findings. In January 2002, Dr. Bodell determined Mendoza would benefit from decompressive radial tunnel surgery. In April 2002, Dana G. Seltzer, M.D., who worked in the same medical association as Dr. Bodell, examined Mendoza and also concluded she was suffering from right radial tunnel syndrome. Dr. Seltzer further reported Mendoza had experienced occasional

---

9. The administrative law judge had concluded McDonald's had acted in bad faith by refusing to authorize the surgery recommended by Dr. Roesener because it had failed to show good cause as to why that treatment was inappropriate. Another panel of this court held this finding was inconsistent with the administrative law judge's additional finding that McDonald's had properly terminated temporary total disability benefits because Mendoza had failed to return to light-duty work after being released to do so. We explained: "[Mendoza] could not both be entitled to have had surgery and physical therapy recommended by her treating physician, and at the same time have been obligated to return to work." *Mendoza,* 1 CA–IC 99–0113, slip op. at ¶ 12.

10. Mendoza, whose primary language is Spanish, often took an English-speaking family member or friend with her to her medical examinations because few of the doctors she saw spoke Spanish.

symptoms of RSD with some swelling, sweating, and cold intolerance.

¶ 18 In August 2002, Dr. Bodell asked McDonald's to approve right radial tunnel syndrome surgery. Dr. Bodell's office documented that McDonald's refused to authorize the surgery because Mendoza's claim was "in litigation," a reference to the ongoing ICA proceedings. In October 2002, Dr. Guidera conducted a second independent medical examination of Mendoza with help from a professional bilingual interpreter. Describing Mendoza's subjective symptoms as "disproportionate" to his objective clinical findings, Dr. Guidera nevertheless recommended additional diagnostic studies to determine whether Mendoza had a radial nerve impairment. He concluded that if the studies were positive, then work restrictions and even surgery might be indicated. In April 2003, McDonald's authorized the studies.

¶ 19 McDonald's asked Dr. Guidera to perform a third independent medical examination of Mendoza in July 2003. During the evaluation, Mendoza was unable to understand his questions as no interpreter was present, and Dr. Guidera terminated the evaluation without examining Mendoza. In his report to McDonald's, Dr. Guidera noted he had examined Mendoza in the past and she had been able to understand his questions. However, as he later acknowledged during trial, on both occasions he had examined her with help from an English-speaking relative or interpreter. Nevertheless, based on Dr. Guidera's report, McDonald's terminated all compensation and medical payment benefits, asserting Mendoza had refused to submit to or obstructed the medical examination. Mendoza protested McDonald's termination of benefits, and McDonald's reinstated benefits in March 2004 after confirming—consistent with information contained in its claim file from its inception—that Mendoza's primary language was Spanish, not English.

¶ 20 Also in March 2004, after this court set aside the First ALJ Decision, a different administrative law judge found Mendoza had been entitled to temporary total disability benefits from the date of the accident, June 3, 1997, until her condition became medically stationary ("Second ALJ Decision"). Ac-

cordingly, McDonald's should not have terminated Mendoza's temporary total disability benefits as of January 13, 1998. The administrative law judge also concluded McDonald's had committed bad faith under A.R.S. § 23-930 (Supp.2008) by unreasonably delaying approval of the carpal tunnel surgery. The administrative law judge stated he was particularly troubled by McDonald's reliance for several months in 1998 on the November 1997 notice of claim to deny Mendoza treatment for carpal tunnel syndrome and its decision in May 1998 to have Mendoza examined by Dr. Lipton even though she had already been examined in December 1997 at McDonald's request by Dr. Joseph.

¶ 21 In April 2004, at McDonald's request, Peter J. Campbell, M.D., another hand surgeon, conducted another independent medical examination of Mendoza. Dr. Campbell concluded Mendoza had right radial tunnel syndrome and would benefit from radial nerve decompression surgery. McDonald's thereafter authorized radial tunnel surgery on May 26, 2004, which Dr. Bodell performed on June 28, 2004. Although the surgery was deemed successful, Mendoza continued to experience pain. Because of her ongoing pain and inability to work, she experienced persistent depression and asked McDonald's to authorize psychological evaluation and treatment. It refused to do so.

¶ 22 In September 2005, Dr. Campbell examined Mendoza again. Dr. Campbell concluded further therapy or surgical intervention would not improve Mendoza's subjective complaints of pain. Although Dr. Campbell found Mendoza could not tolerate significant heavy lifting with her right arm, he nevertheless concluded her condition was stable and she was able to return to work with a permanent restriction of lifting no more than ten pounds with her right arm. McDonald's then terminated Mendoza's temporary total disability benefits and continued to deny Mendoza's request for psychological care.

¶ 23 Mendoza protested both the termination of her temporary total disability benefits and the denial of psychological care. In October 2006, an ICA administrative law judge rejected McDonald's assertion Mendoza's pain and depression were unrelated to

the industrial injury, reinstated temporary total disability benefits, and awarded Mendoza the additional treatment she had requested, including psychological and pain management treatment ("Third ALJ Decision").

## II. This litigation

¶ 24 In October 2000, Mendoza sued McDonald's for breach of the implied covenant of good faith and fair dealing in the administration of her workers' compensation claim. She subsequently filed two additional lawsuits asserting the same claim, and all three actions were eventually consolidated.

¶ 25 In January 2006, Mendoza asked the superior court to enter an order that certain facts regarding the compensability of her claim had been established in the ICA proceedings and were entitled to preclusive effect against McDonald's. See infra ¶¶ 57–58. McDonald's opposed Mendoza's request, asserting Mendoza had failed to disclose to her physicians and to the independent medical examiners in the workers' compensation case and in the bad faith litigation that she had sustained an industrial injury to her right arm before the McDonald's accident, and had been treated for chronic pain and problems with her right hand and wrist as well as depression from at least 1991 through 1994. McDonald's also asserted Mendoza had not disclosed her prior right arm injury or problems with her right arm when asked about these subjects during her 1998 deposition. See supra ¶ 8. Accordingly, McDonald's argued that because of Mendoza's "lies" and "frauds," none of the facts found by the administrative law judges in the ICA proceedings were entitled to preclusive effect.

¶ 26 Mendoza responded to McDonald's argument by asserting she had not understood the questions asking about her prior arm problems during her 1998 deposition and had explained this at the December 10, 1998, ICA hearing. She also asserted she had attempted to talk about her prior right arm injuries in a 2001 deposition in the ICA proceedings but had been prevented from doing so by McDonald's attorney, who was trying to restrict her testimony so he could impeach her later. Mendoza further provided the court with documents establishing that, before her 1998 deposition, her lawyer had given McDonald's ICA attorney medical records documenting her 1991 industrial injury to her right arm; that McDonald's ICA counsel had informed Dr. Lipton in May 1998 about this injury; that in May 2001, she had provided further information and a medical release to McDonald's so it could obtain all of her medical records from her health care provider, Clinical Adlante; that McDonald's had obtained these records (the "Clinical Adlante records"); and that, in July 2001, it had submitted a subset of the Clinical Adlante records which reflected her prior right arm injury and problems to the ICA administrative law judge who issued the Second ALJ Decision. She also provided the court with a November 26, 2001, letter from a claims adjuster to McDonald's reporting: "Ms. Mendoza has many prior claims, injuries and pre-existing conditions. However, it does not appear that she has any previous impairment rating which would affect the closure of this case."

¶ 27 The court denied Mendoza's preclusion request, but directed the parties to prepare a stipulation that could be read to the jury that reflected what matters were heard and decided in the ICA proceedings. When the parties were unable to agree on such a stipulation, the court prepared an instruction concerning these matters. The instruction essentially outlined certain events regarding Mendoza's workers' compensation claim and summarized the administrative law judges' decisions. Thus, the court instructed the jury Mendoza had claimed to have suffered a workplace injury to her right arm while employed by McDonald's and the ICA administrative law judges had ruled she was entitled to treatment and disability benefits. Both before and during trial, Mendoza objected to the court's instruction because it failed to tell the jury it was required to accept certain facts as true—that, for example, Mendoza had in fact been injured on the job and her injury required surgery and entitled her to disability benefits. As Mendoza saw the situation, the court's instruction stopped short of telling the jury it was bound by the underlying facts found by the ICA administrative

law judges and would allow McDonald's to relitigate these factual issues.

¶ 28 As Mendoza feared, McDonald's presented extensive evidence at trial regarding her pre-existing injury and medical history, and contested whether she had actually been injured at McDonald's and whether, if so, her injury had caused carpal tunnel syndrome, radial tunnel syndrome, and any ongoing psychological problems or physical pain. Although Mendoza's treating physicians and medical experts testified McDonald's delay in authorizing carpal and radial tunnel surgery [11] and treatment for depression and pain had caused her current pain disorder,[12] McDonald's medical expert witnesses—the doctors who had independently examined Mendoza during the course of the ICA proceedings—challenged this testimony. Dr. Guidera questioned whether Mendoza had ever suffered from carpal or radial tunnel syndrome. Conversely, although Dr. Lipton believed Mendoza had suffered from carpal tunnel syndrome, he testified he doubted the accident at McDonald's had caused the syndrome. And, Drs. Campbell and Joseph disputed whether Mendoza was actually suffering from a pain disorder.

¶ 29 At the conclusion of a three-week trial, the jury found McDonald's had acted in bad faith and awarded Mendoza $250,000 in compensatory damages. The jury did not award Mendoza punitive damages. After the court entered judgment and denied Mendoza's motion for new trial, Mendoza timely appealed; McDonald's timely cross-appealed. We have jurisdiction over Mendoza's appeal and McDonald's cross-appeal pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12–120.21(A)(1) and –2101(B) and (F) (2003).

## DISCUSSION

### I. Compensatory Damages

 ¶ 30 Over Mendoza's objection, the superior court refused to instruct the jury that in awarding compensatory damages for McDonald's breach of the covenant of good faith and fair dealing, it could consider, first, pain and suffering; second, lost earnings and any decrease in future earning power or capacity (collectively, "lost earnings"); and third, future medical expenses reasonably necessary to address the aggravation of Mendoza's work-related injury.[13] The superior court reasoned that damages for pain and suffering, lost earnings, and medical expenses arose out of the industrial injury and were barred by the exclusive remedy provision of the Arizona Workers' Compensation Act. See A.R.S. § 23–1022(A) (1995). Thus, the court limited the compensatory damages the jury could award to emotional distress and loss of enjoyment of life damages.[14] Although Mendoza concedes she was not entitled to recover damages for the underlying industrial injury or any damages for wage losses and medical expenses paid to or for her by McDonald's on her workers' compen-

11. Physician-witnesses called by Mendoza testified Mendoza's carpal tunnel and radial tunnel syndromes had either been caused by the McDonald's work injury or that injury had aggravated what one doctor characterized as her "beginning stages of carpal tunnel" because of repetitive work.

12. At trial, Dr. Bodell testified Mendoza was suffering from "centrally mediated pain." Richard M. Braun, M.D., diagnosed Mendoza as suffering from RSD, while Joshua P. Prager, M.D., M.S., believed Mendoza had developed a similar pain disorder, known as complex regional pain syndrome ("CRPS"). For our purposes, the distinctions between centrally mediated pain, RSD, and CRPS are irrelevant.

13. Before trial, Mendoza had submitted to the court a compensatory damage instruction based on suggested civil jury instructions prepared by the Civil Jury Instructions Committee of the State Bar of Arizona concerning insurance bad faith in a situation in which the plaintiff has suffered physical injury as a result of the defendant insurer's alleged bad faith. See Rev. Ariz. Jury Instr. ("RAJI") (Civil), at 87, 108 (4th ed.2005).

14. The court instructed the jury it could award compensatory damages for:

1. Emotional distress, humiliation, inconvenience, and anxiety experienced, and reasonably probable to be experienced in the future.
2. Loss of love, care, affection, companionship, and other pleasures of the family relationship.
3. Loss of the enjoyment of life, that is, the participation in life's activities to the quality and extent she would have enjoyed had McDonald's not acted in bad faith.

sation claim, she argues she was nevertheless entitled to recover the full range of available tort damages caused by McDonald's bad faith, which would include damages for pain and suffering, lost earnings, and medical expenses.[15] We agree.

¶ 31 In *Franks v. United States Fidelity & Guaranty Co.*, 149 Ariz. 291, 718 P.2d 193 (App.1985), we recognized bad faith is a separate tort, and not a direct or natural consequence of a compensable workers' compensation injury. In that case, an injured worker sued his employer's workers' compensation insurer for breach of the duty of good faith and fair dealing. *Id.* at 293, 718 P.2d at 195. The worker accused the insurer of failing to make adequate disability compensation payments, delaying payment of disability benefits, and terminating or denying benefits without adequate information. *Id.* In addition to punitive damages, the worker requested damages for mental and emotional distress and loss of use of compensation and medical benefits. *Id.* The insurer asserted the court did not have jurisdiction to address the worker's claim because of the exclusive remedy provisions of the Workers' Compensation Act. *Id.* at 294, 718 P.2d at 196. We rejected that argument, holding the worker's bad faith claim constituted a completely independent tort cause of action and was, thus, not within the purview of the exclusivity provision. *Id.* at 296, 718 P.2d at 198. In so holding, we quoted with approval and relied on the Colorado Supreme Court's decision in *Travelers Insurance Co. v. Savio*, 706 P.2d 1258 (Colo.1985):

[A] compensation carrier's intentional misconduct in the processing of a claim is neither a "direct" nor a "natural" consequence of an employment injury. Any liability for injuries occasioned by such conduct cannot be deemed liability for injuries arising out of the course of employment.

*Franks*, 149 Ariz. at 295–96, 718 P.2d at 197–98 (quoting *Savio*, 706 P.2d at 1265). We also noted that "nowhere does the Arizona Workers' Compensation Act address the injuries claimed by Franks." *Id.* at 296, 718 P.2d at 198. *See also Stoecker v. Brush Wellman, Inc.*, 194 Ariz. 448, 451, ¶ 9, 984 P.2d 534, 537 (1999) ("claims that do not fall within the scope of the workers' compensation statute are not barred by its exclusivity provision"); *Boy v. Fremont Indem. Co.*, 154 Ariz. 334, 338, 742 P.2d 835, 839 (App.1987) (bad faith is separate tort that is not a direct or natural consequence of the original injury compensable under the workers' compensation scheme).

¶ 32 In a "traditional" first-party bad faith case—one in which an insured is suing its own insurer—the insured is entitled to recover ordinary tort damages. *Rawlings v. Apodaca*, 151 Ariz. 149, 161, 726 P.2d 565, 577 (1986) (bad faith claimant "may recover all the losses caused by [the] defendant's conduct, including damages for pain, humiliation and inconvenience, as well as for pecuniary losses"). A bad faith claim by an injured employee against his or her employer's workers' compensation carrier is considered a first-party claim. *Franks*, 149 Ariz. at 295, 718 P.2d at 197. Therefore, the bad faith damage instruction Mendoza submitted to the superior court accurately set out the types of ordinary tort damages a first-party bad faith claimant like Mendoza can recover. That instruction also properly explained such damages must derive from McDonald's bad faith handling of her claim, *not* from the workplace injury giving rise to her claim. Because the jury was not properly instructed on compensatory damages and the superior court's failure to do so prejudiced Mendoza, we vacate that part of the judgment awarding Mendoza $250,000 in compensatory damages and remand for a new trial on that issue.[16]

15. "We review jury instructions as a whole to determine whether the jury was properly guided in its deliberations. An instruction will only warrant reversal if it was both harmful to the complaining party and directly contrary to the rule of law." *Powers v. Taser Int'l, Inc.*, 217 Ariz. 398, 400, ¶ 12, 174 P.3d 777, 779 (App.2007) (citation omitted).

16. In so doing, we reject Mendoza's assertion she should be allowed to retain the $250,000 in compensatory damages awarded by the jury because they represent "established" emotional distress damages.

¶ 33 We recognize that, pursuant to the Workers' Compensation Act, Mendoza has received disability and medical benefits, and, as discussed above, in October 2006 the Third ALJ Decision awarded Mendoza, as the jury was instructed, "aggressive physical therapy, pain management and behavioral treatment including psychological counseling for pain in her right arm." However, the workers' compensation system only compensates an injured worker for medical expenses and lost income caused by an illness or injury arising out of the worker's employment and suffered in the course of employment. *See* Ray Jay Davis et al., *Arizona Workers' Compensation Handbook* II–1 (1992). On remand, insofar as Mendoza is able to show she has incurred or will incur medical expenses or lost earnings proximately caused by Mc-Donald's bad faith in handling her workers' compensation claim, and not proximately caused by her workplace injury giving rise to that claim, recovery of those damages falls outside the coverage of the Workers' Compensation Act. Thus, Mendoza is entitled to seek damages for pain and suffering,[17] past and future medical expenses, and lost earnings proximately caused by McDonald's bad faith handling of her workers' compensation claim.

¶ 34 Nothing we have said authorizes Mendoza to receive a "double recovery" if the jury decides to award her compensatory damages for past and future medical expenses and lost earnings attributable to Mc-Donald's bad faith. Although Mendoza has consistently acknowledged she is not entitled to a double recovery,[18] neither she nor Mc-

---

17. Although McDonald's argued in the superior court the Workers' Compensation Act barred Mendoza from recovering damages for pain and suffering in this case, it has abandoned—correctly, we note—this argument on appeal. Under Arizona's workers' compensation scheme, pain and suffering is not compensable. *Stout v. State Comp. Fund,* 197 Ariz. 238, 243, ¶ 25, 3 P.3d 1158, 1163 (App.2000). Accordingly, the Act never applied to the damages Mendoza requested for any pain and suffering caused by McDonald's bad faith. Instead, McDonald's now argues the court's instruction to the jury that it could award damages for "loss of enjoyment of life," also known as "hedonic damages," was "sufficiently broad to include pain and suffering damages." We disagree. We have held "hedonic damages can be a component of a general damages claim, distinguishable from, and not duplicative of, damages for pain and suffering." *Ogden v. J.M. Steel Erecting, Inc.,* 201 Ariz. 32, 38, ¶ 26, 31 P.3d 806, 812 (App.2001). We subsequently interpreted *Ogden* to stand for "the proposition that when a jury makes a general damages determination, a court may properly instruct it on damages for loss of enjoyment of life as a component of general damages without necessarily duplicating damages awarded for pain and suffering" because each damage claim is "a slightly different way of arguing for a general damages award." *Quintero v. Rogers,* 221 Ariz. 536, 540, ¶ 9, 212 P.3d 874, 878 (App.2009). An award for pain and suffering compensates the injured person for the physical discomfort and the emotional response to the sensation of pain caused by the injury. Hedonic damages compensate a person for the limitations caused by the defendant's tortious conduct on the injured person's ability to participate in and derive pleasure from the normal activities of daily life, or for the individual's ability to pursue his or her talents, recreational interests, hobbies, or avocations. *Ogden,* 201 Ariz. at 39, ¶ 31, 31 P.3d at 813.

18. Mendoza's concession is consistent with the approach taken by other courts in similar situations. *See, e.g., Unruh v. Truck Ins. Exch.,* 7 Cal.3d 616, 102 Cal.Rptr. 815, 498 P.2d 1063, 1077–78 (1972) (acceptance of workers' compensation benefits does not preclude worker's claims for intentional torts; worker is not entitled to double recovery and carrier entitled to set off the amount of compensation benefits which it was required to pay because of the aggravation of the original industrial injury produced by its intentional torts), *superseded in part by statute,* Cal. Stat.1982, ch. 922, § 6 (abolishing dual capacity doctrine); *Savio,* 706 P.2d at 1266 n. 8 (suggesting that in computing damages for loss of income caused by carrier's bad faith it may be appropriate to prevent double recovery to set off the loss by the amount of compensation the carrier paid the worker); *Millison v. E.I. du Pont de Nemours & Co.,* 101 N.J. 161, 501 A.2d 505, 519 (1985) (workers entitled to pursue intentional tort claims against employer for fraudulently concealing they were suffering from asbestos-related diseases, thereby delaying their treatment and aggravating their existing illnesses which were compensable under workers' compensation scheme; however, if workers prevailed in civil suit, carrier would be entitled to offset compensation benefits previously paid to the extent civil damage award would grant double recovery); *Reese v. Sears, Roebuck & Co.,* 107 Wash.2d 563, 731 P.2d 497, 503 (1987) (workers' compensation scheme does not bar statutory claim for disability discrimination under state statute; compensation benefits received by workers after their discrimination claims matured can be deducted from the discrimination damages received to prevent double recovery), *overruled on other grounds by Phillips v. City of Seattle,* 111 Wash.2d 903, 766 P.2d 1099, 1102 (1989).

Donald's has briefed how the superior court, and perhaps the ICA, should handle this issue. Thus, other than noting it, we express no opinion as to any specific measures the superior court may take to ensure Mendoza does not receive a double recovery. On remand, the superior court may address it.

## II. Attorney–Client Privilege

¶ 35 By June 2002, without redaction or claim of privilege, McDonald's had voluntarily provided Mendoza portions of the file maintained by its claims adjusters regarding her workers' compensation claim. The documents produced included the adjusters' claim file or diary notes from the filing of the claim through 1998. In July 2003, McDonald's started redacting the adjusters' notes it produced to Mendoza ("redacted material"), claiming the attorney-client privilege shielded it from discovery.[19] Subsequently, Mendoza moved to compel McDonald's to produce the entire adjusters' claim file, including the redacted material. Mendoza argued McDonald's had impliedly waived the attorney-client privilege with respect to the redacted material or, in the alternative, had asserted the attorney-client privilege too broadly. She asked the court to review *in camera* an unredacted copy of the claim file to determine whether McDonald's had properly asserted the privilege. Relying on *State Farm Mutual Auto. Insurance Co. v. Lee*, 199 Ariz. 52, 13 P.3d 1169 (2000), McDonald's denied it had impliedly waived the attorney-client privilege, arguing it had never "put into issue" the redacted material because it was not claiming its conduct in handling Mendoza's workers' compensation claim was "subjectively reasonable based on its ... subjective understanding of the law."

¶ 36 Following argument on the motion and an *in camera* review of the entire claim file, including the redacted material, the court found the attorney-client privilege had not been waived and denied Mendoza's motion to produce:

> [Mendoza] also argues that the attorney client privilege does not apply under *State Farm Mut. Auto. Ins. v. Lee*, 199 Ariz. 52, 13 P.3d 1169 (2000). This court declines to read that case as broadly as plaintiff urges. In this case, defendant has not claimed that there is no bad faith because it relied on the advice of counsel, nor has it claimed as a defense that it relied on a subjective evaluation of the law that incorporates what it learned from its attorneys.

¶ 37 On appeal, Mendoza argues the superior court should have ordered McDonald's to produce the redacted material because McDonald's had impliedly waived the privilege.[20] She further argues the superior court's ruling prejudiced her case by depriving her of relevant evidence that McDonald's had acted with the necessary "evil mind" to allow the jury to assess a punitive damages award. We agree with both arguments.[21]

¶ 38 In *Lee*, our supreme court outlined the test for determining whether an insurer has impliedly waived the attorney-client privilege in a bad faith tort action. *Lee* involved a class action lawsuit brought by automobile insurance policyholders against their insurer alleging the insurer had acted in bad faith in denying their underinsured and uninsured motorist claims. 199 Ariz. at 54, ¶ 1, 13 P.3d at 1171. The insurer admitted it had sought and received advice of counsel about whether to pay or reject the policyholders' claims, but refused to produce its correspondence with counsel, arguing the attorney-client privilege shielded it from discovery. *Id.* at 55, ¶ 5, 13 P.3d at 1172. Because the insurer avowed it

---

**19.** McDonald's also claimed the work-product doctrine protected much of the redacted material from discovery. The court rejected that argument and ordered McDonald's to produce the material from the claim file it had withheld based solely on the work-product doctrine. The court's ruling on the work-product doctrine is not at issue in this appeal.

**20.** "[W]hether a party has waived the attorney-client privilege is a mixed question of law and

fact which we review de novo." *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 254, ¶ 10, 63 P.3d 282, 285 (2003) (quoting *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir.1995)).

**21.** Because we agree McDonald's impliedly waived the attorney-client privilege, we need not address Mendoza's other arguments concerning the privilege.

would not rely on an express advice-of-counsel defense but rather would defend on the basis that its decision to deny the claims was objectively and subjectively reasonable given its claims managers' evaluation of the law, the insurer asserted it had not waived the attorney-client privilege. *Id.* at 57–58, ¶¶ 13–15, 13 P.3d at 1174–75. The policyholders disagreed, arguing the insurer had impliedly waived the privilege by interjecting into the case the subjective good faith beliefs and mental state of its agents, which were based at least in part on what they had learned from counsel. *See id.* at 55, 57, ¶¶ 5 & 14, 13 P.3d at 1172, 1174.

¶ 39 Adopting what is known as the *Hearn* test[22] for determining when a party has impliedly waived the attorney-client privilege, the supreme court held: "in cases such as this in which *the litigant* claiming the privilege *relies* on and advances as a claim or defense a subjective and allegedly reasonable evaluation of the law—but an evaluation that necessarily incorporates what the litigant learned from its lawyer—the communication is discoverable and admissible." *Id.* at 58, ¶ 15, 13 P.3d at 1175.

¶ 40 But the supreme court also made clear that when an insurer defends a bad faith claim exclusively on the basis its actions were objectively reasonable and "merely ask[s] its expert witness[es] to evaluate the reasonableness of its conduct under the statutes, the case law, and the policy language," the insurer has not impliedly waived the attorney-client privilege because it has not put any advice it received from counsel at issue. *Id.* at 60, ¶ 22, 13 P.3d at 1177. Mere denial of bad faith and an affirmative claim of good faith is not enough to constitute an implied waiver of the privilege; instead, a party will be deemed to have waived the privilege if it

asserted some claim or defense, such as the reasonableness of its evaluation of the

law, which necessarily includes the information received from counsel. In that situation, the party claiming the privilege has interjected the issue of advice of counsel into the litigation to the extent that recognition of the privilege would deny the opposing party access to proof without which it would be impossible for the factfinder to fairly determine the very issue raised by that party.

*Id.* at 62, ¶ 28, 13 P.3d at 1179.

¶ 41 Applying *Lee* to the facts of this case, Mendoza contends McDonald's impliedly waived the privilege as to the redacted material because its ICA attorneys regularly influenced and directed McDonald's claims decisions and, by representing its actions were subjectively reasonable (despite evidence to the contrary) while at the same time asserting the privilege, it was able to hide the real reasons for its decisions. In response, McDonald's essentially argues *Lee* and its treatment of implied waiver is inapplicable here because it did not defend its actions based on the reasonableness of its subjective evaluation of the law. Instead, McDonald's argues it defended its actions by contending they were objectively reasonable—a defense, we note, that would not put McDonald's subjective reasonableness at issue or place at risk its assertion of the privilege. *See id.* at 56, ¶ 8, 13 P.3d at 1173 ("If State Farm had merely denied bad faith and defended on an objective basis, without advancing its agents' subjective understanding of the law, we would have a different case."); *see also id.* at 60, ¶ 22, 13 P.3d at 1177 ("If State Farm were merely asking its expert witness to evaluate the reasonableness of its conduct under the statutes, the case law, and the policy language, State Farm would not have put counsel's advice to the claims managers at issue; nor would Plaintiffs need to know what the claims managers actually believed ... to prove that State Farm's position was not objectively reasonable.").

---

**22.** Under the *Hearn* test, a court must find (1) assertion of the privilege was a result of some affirmative act, such as filing suit [or raising an affirmative defense], by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3)

application of the privilege would have denied the opposing party access to information vital to his [claim or] defense. *Lee,* 199 Ariz. at 56, ¶ 10, 13 P.3d at 1173 (quoting *Hearn v. Rhay,* 68 F.R.D. 574, 581 (E.D.Wash.1975)).

¶ 42 Addressing McDonald's arguments first, although we agree it did not defend by arguing its subjective evaluation of the law was reasonable, there is nothing in *Lee* to suggest an insurer will *only* be deemed to impliedly waive the privilege when it argues its actions were reasonable based on its subjective evaluation of the law. The implied waiver discussed in *Lee* arose out of the insurer's evaluation of the law, and thus the court discussed implied waiver in that context, but the supreme court did not suggest, as McDonald's believes, that an insurer will be deemed to have impliedly waived the privilege only when it argues its actions were subjectively reasonable based on its evaluation of the law or on the advice of counsel.[23] At the heart of *Lee* is the recognition that, in the bad faith context, when an insurer raises a defense based on factual assertions that, either explicitly or implicitly, incorporates the advice or judgment of its counsel, it cannot deny an opposing party the opportunity to discover the foundation for those assertions in order to contest them. *Id.* at 61, ¶ 23, 13 P.3d at 1178 (discussing with approval *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 259–60 (Del.1995)).

¶ 43 Further, contrary to its characterization, McDonald's did not simply defend this case based on the objective reasonableness of its conduct. Rather, it affirmatively asserted its actions in investigating, evaluating, and paying Mendoza's claim were subjectively reasonable and taken in good faith.

¶ 44 Through the testimony of its bad faith expert witness, Robert Wisniewski, McDonald's presented evidence it had not used independent medical examinations to deny or delay benefits, despite adjuster notes that stated certain examinations were being scheduled to "cut" benefits or support a previous denial of benefits. He testified references in the notes to "get this claim closed" or other similar wording constituted nothing more than adjuster "jargon" for moving a claim from one stage to another. Wisniewski also explained the reason McDonald's adjusters had sent Mendoza to so many different doctors was "they were trying to give her the benefit of the doubt," and were "trying to find out what [was] wrong with her and address it." Although he admitted an insurer could improperly attempt to close a claim by looking for a doctor who would provide it with an independent medical examination supporting closure, he stated McDonald's had not done that. Rather, it "took the independent examinations and the facts established in those independent examinations and proceeded on with them and awarded the benefits as they were appropriate."

¶ 45 Chargaulaf, the McDonald's employee who handled Mendoza's claim from November 1997 through December 1998, *see supra* note 2, testified similarly. She stated she had never tried to deny Mendoza's claim or delay it "with either the hope that [Mendoza] would give up or go away." Instead, she explained she had denied Mendoza's request for carpal tunnel surgery because she had believed the findings of Drs. Del Deo, Joseph, and Lipton provided a reasonable basis for doing so. She further testified she and

---

23. McDonald's also relies on *Twin City Fire Insurance Co. v. Burke*, 204 Ariz. 251, 63 P.3d 282, to assert implied waiver under *Lee* is limited to instances in which the insurer argues its actions were reasonable based on its subjective evaluation of the law. This reliance is misplaced. The issue in *Twin City* was whether an excess insurer waives its attorney-client privilege simply by bringing an action against a primary insurer for bad faith when that action is based solely on the primary insurer's conduct. *Id.* at 253, ¶ 9, 63 P.3d at 284. Our supreme court held the excess insurer had not waived the attorney-client privilege because the mental state of the excess insurer and the conduct of its agents and counsel were not at issue in the bad faith action *it* had brought against the primary insurer, and at no point had the excess insurer interjected its own privileged communications into the suit. *Id.* at 255, ¶ 14,

63 P.3d at 286. The court re-emphasized that an implied waiver under *Lee* occurs when the "party claiming the privilege has interjected the issue of advice of counsel into the litigation to the extent that recognition of the privilege would deny the opposing party access to proof without which it would be impossible for the factfinder to fairly determine the very issue raised by that party." *Id.* at 255, ¶ 14, 63 P.3d at 286 (quoting *Lee*, 199 Ariz. at 62, ¶ 28, 13 P.3d at 1179). The court used the example from *Lee* of an insurer defending a bad faith claim "on the theory that its mental state was based on its evaluation of the law and the facts show that evaluation included and was informed by advice from [its] legal counsel" as an *illustration* of this principal, rather than a *limitation* on it. *Id.* at 257, ¶ 23, 63 P.3d at 288 (quoting *Lee*, 199 Ariz. at 65 n. 7, ¶ 33, 13 P.3d at 1182 n. 7).

other McDonald's employees who had handled Mendoza's claim had been motivated by a desire to make sure that Mendoza received "the care that was most appropriate or at least [she] explored her options."

¶ 46 Through this and other evidence, McDonald's depicted its claims adjusters as attempting to act in Mendoza's best interest, using information from the independent medical examinations to determine what treatment would be best for her, and encouraging her to receive the best care available after a full consideration of all of her options. In representing its conduct this way, McDonald's affirmatively placed in issue the subjective motives of its adjusters in administering Mendoza's claim. It thus defended this case based on the subjective reasonableness of its conduct.

¶ 47 McDonald's portrayal of its subjective motives in handling Mendoza's claim is, however, belied by other evidence. This evidence not only reflects McDonald's forced Mendoza to "go through needless adversarial hoops to achieve" her workers' compensation benefits, *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 238, ¶ 21, 995 P.2d 276, 280 (2000), but that it did so based on advice from and judgments made by its ICA counsel.

¶ 48 For example, Chargaulaf testified McDonald's scheduled Dr. Lipton's May 1998 independent medical examination of Mendoza, *see supra* ¶ 9, based on the recommendation of its ICA attorney, even after Dr. Joseph had examined her in December 1997. Although when deposed she could no longer remember exactly why the ICA attorney had requested Dr. Lipton's examination, she stated it was possible the ICA attorney wanted to find a doctor who would disagree with Dr. Joseph's conclusion Mendoza's carpal tunnel syndrome was work related and who would support McDonald's denial of benefits.

¶ 49 Chargaulaf further acknowledged that despite her decision accepting Mendoza's carpal tunnel syndrome as compensable in January 1998, *see supra* ¶ 5, on advice of counsel, McDonald's then began to assert Mendoza's carpal tunnel syndrome was not work related, *see supra* ¶ 7—a position with which Chargaulaf did not agree and thought would

be in bad faith. In a claim note Chargaulaf authored in May 1998, she confirmed she had spoken to one of McDonald's ICA attorneys who informed her he would "set up another independent medical exam to support our denial. He will also forward us a list of good doctors in the state." Chargaulaf also admitted, when deposed, that even though she had notified Mendoza in July 1998 McDonald's would accept Mendoza's carpal tunnel syndrome as compensable, she relied on counsel's advice in delaying surgical authorization through the end of her involvement with the claim in December 1998.

¶ 50 Chargaulaf was not the only claims adjuster who relied on ICA counsel in deciding how to administer Mendoza's claim. Carol Ward and Heather Bilodeau, employees of a contractor retained by McDonald's to administer its workers' compensation claims, *see infra* note 28, did so too. Indeed, Ward explained in her deposition that she had relied on the advice of one of McDonald's ICA attorneys in, as she documented in a claim note, scheduling an independent medical examination with Dr. Guidera "for closure" and to "[g]et this claim closed."

¶ 51 Whether McDonald's subjective motives were as it represented, or whether it acted improperly to "cut" benefits and "close" Mendoza's claim, are not issues we must decide. By electing to defend this case based on the subjective, not just objective, reasonableness of its adjusters' actions, McDonald's placed in issue their subjective beliefs and directly implicated the advice and judgment they had received from McDonald's ICA counsel incorporated in those actions. McDonald's thus rendered the advice and judgment its adjusters received from its ICA counsel relevant to the case. *See Lee,* 199 Ariz. at 61, ¶ 23, 13 P.3d at 1178 ("Where ... *an insurer makes factual assertions in defense of a claim which incorporate, expressly or implicitly, the advice and judgment of its counsel,* it cannot deny an opposing party 'an opportunity to uncover the foundation for those assertions in order to contradict them.'" (quoting *Tackett,* 653 A.2d at 259 (citations omitted))); *see also Roehrs v. Minn. Life Ins. Co.,* 228 F.R.D. 642, 646–47 (D.Ariz.2005) (three adjusters

testified in pretrial depositions they considered and relied upon legal opinions and legal investigation in denying coverage for insureds' claims; because insurer could not "reasonably deny that what these employees knew at the time they denied the [insureds'] claims included information received from their lawyers" and "[w]hat formed the subjective good faith beliefs and mental states of these three adjusters and the reasonableness of their decisions [was] critical in defense of the [insureds'] bad faith claim," insurer had placed attorney-client privileged material at issue and impliedly waived the privilege under *Lee* ).

¶ 52 In asserting the attorney-client privilege, McDonald's sought to shield from Mendoza the very evidence she would need to challenge its representations that its adjusters subjectively believed their actions were reasonable and taken in good faith. A party is not allowed to assert the privilege when doing so "places the claimant in such a position, with reference to the evidence, that it would be unfair and inconsistent to permit the retention of the privilege" because the attorney-client privilege "is not to be both a sword and a shield." *Lee*, 199 Ariz. at 56, ¶ 9, 13 P.3d at 1173 (quoting *Throop v. F.E. Young & Co.*, 94 Ariz. 146, 158, 382 P.2d 560, 568 (1963)). We therefore reverse the superior court's order denying production of the redacted material.

¶ 53 Although McDonald's bad faith liability is no longer an issue in this case because of the jury's verdict in favor of Mendoza on that issue, the state of mind of the McDonald's employees and agents who administered her workers' compensation claim is relevant to the issue of punitive damages— an issue the jury decided in McDonald's favor. We have independently reviewed the material McDonald's redacted from the adjusters' notes in the claim file under the assertion of the attorney-client privilege;[24] this material included evidence that could be relevant to Mendoza's punitive damages claim. The superior court's ruling on McDonald's assertion of the attorney-client privilege precluded Mendoza from presenting this evidence to the jury, thus prejudicing her pursuit of a punitive damages award. Consequently, we remand for a new trial on punitive damages.[25] On remand, except as we instruct,[26] the superior court shall order McDonald's to produce to Mendoza those portions of the adjusters' notes in the claim file it redacted based on its assertion of the attorney-client privilege.[27]

---

**24.** On April 17, 2008, this court granted Mendoza's motion for an order requiring McDonald's to submit under seal the unredacted claim file reviewed by the superior court. Accordingly, McDonald's filed a copy of Mendoza's unredacted claim file with this court. We have reviewed that file, along with copies of the privilege logs and redacted claim file McDonald's produced to Mendoza during discovery.

**25.** We note Mendoza has not argued, as she did in the superior court, that McDonald's impliedly waived the attorney-client privilege with respect to its attorneys' file in Mendoza's workers' compensation case. The superior court rejected that argument and Mendoza has not challenged the court's ruling on appeal. Therefore, on remand Mendoza shall not be entitled to inspect McDonald's ICA attorneys' file in Mendoza's workers' compensation case based on our determination that McDonald's impliedly waived the attorney-client privilege with respect to the adjusters' claim file. *See Bogard v. Cannon & Wendt Elec. Co.*, 221 Ariz. 325, 332–33, ¶¶ 24–27, 212 P.3d 17, 24–25 (App.2009).

**26.** In upholding McDonald's assertion of the attorney-client privilege with respect to the adjust- ers' notes in the claim file, the superior court noted: "Some entries in the file regard privileged attorney client communications regarding the pending bad faith litigation in the Superior Court. Both sides agree that those matters are privileged and that those portions of the claims file should not be produced." Nothing in this opinion should be construed as disturbing that portion of the superior court's ruling. Additionally, the superior court granted McDonald's pretrial motion to exclude all references to the findings of bad faith made in the ICA proceedings. Nothing in this opinion should be construed as disturbing that ruling, either.

**27.** Mendoza also argues on appeal the superior court improperly excluded from evidence a November 13, 2001, letter written by one of its ICA attorneys to Bilodeau, the McDonald's agent responsible for administering Mendoza's workers' compensation claim at that time. Because the relevant portions of this letter are set out in an adjuster note previously redacted by McDonald's which Mendoza will be entitled to have access to and use at the partial new trial we have ordered on remand, we need not separately address Mendoza's arguments with respect to the letter's admissibility.

## III. Respondeat Superior

¶ 54 At trial, the superior court instructed the jury as follows on McDonald's respondeat superior liability:

McDonald's, employer and principal, is responsible for the actions of its employees and agents if the employees and agents were acting within the scope of their employment or agency.

In this case, McDonald's, employer and principal, is responsible for the actions of its employees and Gallagher Bassett's employees who worked on Maria Mendoza's workers [sic] compensation case.[28]

In so instructing the jury, the court rejected an instruction submitted by Mendoza that stated McDonald's was also responsible for the actions of its ICA attorneys.

■ ¶ 55 On appeal, Mendoza argues the superior court's refusal to instruct the jury that McDonald's was responsible for the actions of its ICA attorneys prevented her from receiving a fair trial because "the jury was not able to consider all of the acts for which McDonald's should have been held responsible in its consideration of McDonald's liability for bad faith and punitive damages." Because the jury found for Mendoza on the issue of McDonald's liability for bad faith—a finding McDonald's does not challenge in its cross-appeal—we confine our analysis to Mendoza's contention the superior court's refusal to instruct the jury McDonald's was responsible for the actions of its ICA attorneys improperly limited the jury's consideration of McDonald's liability for punitive damages.

■ ¶ 56 We agree with Mendoza, and McDonald's has not argued to the contrary, that under Arizona law, "an insurer who owes the legally imposed duty of good faith to its insured [ ] cannot escape liability for a breach of that duty by delegating it to another, regardless of how the relationship of that third party is characterized." *Walter v. Simmons*, 169 Ariz. 229, 238, 818 P.2d 214, 223 (App.1991). Although in *Walter* we did

not reach the issue of an insurer's vicarious *punitive* liability for its agent's conduct "because there was insufficient evidence to support a punitive damages award against the agent," we have in subsequent cases confirmed that our state's common law doctrine of respondeat superior "allows punitive liability against a principal for the conduct of its agent without any showing of the principal's evil mind." *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 130, 907 P.2d 506, 516 (App.1995). *See also Haralson v. Fisher Surveying, Inc.*, 201 Ariz. 1, 6–7, ¶ 24, 31 P.3d 114, 119–20 (2001) (rule in Arizona is that punitive damages may be awarded against employer for acts of employee as long as acts committed in furtherance of employer's business and within scope of employment); *Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498, 502, 647 P.2d 629, 633 (1982) (same). Because "a lawyer is the agent of his or her client" and "the rules of agency law generally apply" to the attorney-client relationship, *Cahn v. Fisher*, 167 Ariz. 219, 221, 805 P.2d 1040, 1042 (App.1990), it follows that punitive damages may be assessed against an insurer for the actions of its attorney if those actions were taken in furtherance of the insurer's business and within the scope of the attorney's agency. Therefore, the superior court should have instructed the jury McDonald's was responsible for the actions of its ICA attorneys, and that instruction should have applied to McDonald's liability for punitive damages. Thus, on remand, the superior court shall instruct the jury McDonald's liability for punitive damages extends to the actions of its ICA attorneys as well as the actions of its own employees and the Gallagher Bassett employees who worked on Mendoza's workers' compensation claim.

## IV. Preclusion

¶ 57 Mendoza next argues the superior court failed to give preclusive effect to the compensability determinations made by the

---

**28.** When Mendoza initially filed her claim in June 1997, McDonald's maintained its own claim center to process and administer its Arizona workers' compensation claims. That claim center closed in December 1998, and McDonald's hired Gallagher Bassett Services, Inc., a third-party administrator, to process and administer its Arizona workers' compensation claims, including Mendoza's claim.

ICA and left those findings open to attack. Specifically, based on the Second and Third ALJ Decisions, Mendoza asserts the superior court should have barred McDonald's from relitigating the following facts at trial:

1. On June 3, 1997, Maria Mendoza suffered a work injury compensable by McDonald's under the Arizona Workers' Compensation Act;

2. This work injury disabled Mendoza from working and entitled her to temporary disability benefits pending her recovery;

3. This work injury resulted in carpal tunnel syndrome and the need for carpal tunnel surgery compensable by McDonald's as a self-insured employer under the Arizona Workers' Compensation Act;

4. The work injury resulted in radial tunnel syndrome and the need for radial tunnel surgery; and

5. Any injuries or medical conditions of Mendoza that existed prior to June 3, 1997, do not deprive her of the right to treatment for these conditions.

(collectively, "compensability determinations").

¶ 58 Mendoza argues that because the superior court failed to instruct the jury it was required to accept as true the compensability determinations, McDonald's was able to argue at trial that Mendoza had not actually been injured at McDonald's on June 6, 1997, and had perpetrated a fraud by obtaining disability and medical benefits without suffering an actual and compensable injury.[29] Although the jury ruled in her favor on liability, Mendoza asserts the court's failure to accord the compensability determinations preclusive effect allowed McDonald's to unfairly attack her credibility and undermined her ability to establish McDonald's liability for punitive damages.

■ ¶ 59 Because we are remanding this matter for a new trial on compensatory and punitive damages, the dispute between the parties regarding preclusion will likely arise on remand. Thus, we address it.

¶ 60 We agree with Mendoza that, as a matter of law, the superior court was required to accord preclusive effect to the compensability determinations made by the administrative law judges in the ICA proceedings. *See generally Hawkins v. Ariz. Dep't of Econ. Sec.*, 183 Ariz. 100, 103–04, 900 P.2d 1236, 1239–40 (App.1995) (when administrative agency acts in a judicial capacity and resolves disputed issues of fact properly before it and the parties have had an adequate opportunity to litigate, preclusive doctrines of res judicata or collateral estoppel may bar relitigation of those issues of fact); *Nunez v. Ariz. Milling Co.*, 7 Ariz. App. 387, 389–90, 439 P.2d 834, 837 (1968) (ICA has same powers as court to make binding adjudications upon the parties; whether plaintiff was poisoned and whether he was injured by an "accident" occurring in the course of his employment were factual issues determined by the ICA and those determinations "are binding upon the parties in subsequent litigation"). *Cf. Aldrich v. Indus. Comm'n*, 176 Ariz. 301, 306–07, 860 P.2d 1354, 1359–60 (App.1993) (ICA carrier's acceptance of a claim triggers claim preclusion and thus bars relitigation of the elements of a compensable claim at a subsequent ICA claim stage).[30] Accordingly, although the superior court informed the jury it was to accept as true that Mendoza claimed she had suffered an injury to her right arm while working for McDonald's on June 3, 1997, and informed the jury about the compensability rulings made by the administrative law judges, the court's instruction did not direct the jury to accept as true the factual findings established in the compensability determinations, as found by the ICA administrative law judges. The superior court should have instructed the jury on the compensability determinations as quoted above, *see supra* ¶ 57, and, accordingly, should have considered the objections raised

---

29. McDonald's argued in the superior court the compensability determinations were not entitled to preclusive effect because of Mendoza's alleged fraud. *See supra* ¶ 25. McDonald's has not raised this argument on appeal.

30. Given this caselaw, there is no merit to McDonald's argument the ICA compensability determinations should not have preclusive effect in a civil bad faith case because bad faith is an independent tort.

by Mendoza at trial to the evidence introduced by McDonald's in light of the preclusive nature of those determinations.[31]

¶ 61 Our resolution of this issue, however, should not be construed as preventing McDonald's, on remand, from presenting evidence and arguing its administration of Mendoza's workers' compensation claim caused her no harm. As discussed above, Mendoza grounded her bad faith claim on assertions she developed her pain disorder and psychological problems, not as a natural and direct consequence of the industrial injury, but rather, because of McDonald's delay in authorizing carpal and radial tunnel surgery and other related treatment; in other words, McDonald's handling of her workers' compensation claim aggravated the original industrial injury and caused her to develop the pain disorder and psychological problems. Although, on remand, McDonald's should not be allowed to present evidence or argument disputing the compensability determinations, it nevertheless is entitled to present evidence and argument that its handling of Mendoza's workers' compensation claim did not proximately cause her to develop the pain disorder and psychological problems. Likewise, on remand, McDonald's will be entitled to present evidence and argument that it did not act with the requisite "evil mind" for punitive damages.[32]

*V. Cross–Appeal*

¶ 62 In its cross-appeal, McDonald's argues the evidence failed to show it intended to harm Mendoza or pursued a course of conduct knowing that it created a substantial risk of significant harm to her. Accordingly,

McDonald's argues the issue of punitive damages should not have gone to the jury and, presumably, on remand, the jury should not be allowed to consider this issue. We disagree.

¶ 63 To prevail on a claim for punitive damages, the "plaintiff must prove that [a] defendant's evil hand was guided by an evil mind." *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578. This "evil mind" exists when a defendant intends to injure the plaintiff. It can also be found when, although not intending to cause injury, the "defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Id.* Thus, punitive damages can be awarded on proof "from which the jury may find that the defendant was 'aware of and consciously disregard[ed] a substantial and unjustifiable risk that' significant harm would occur." *Id.* (quoting A.R.S. § 13–105(10)(c) (Supp.2008)) (then numbered A.R.S. § 13–105(5)(c)). The burden of proof for punitive damages is clear and convincing evidence. *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 331–32, 723 P.2d 675, 680–81 (1986). Further, the "question of whether punitive damages are justified should be left to the jury if there is any reasonable evidence which will support them." *Farr v. Transamerica Occidental Life Ins. Co. of Cal.*, 145 Ariz. 1, 9, 699 P.2d 376, 384 (App.1984).

¶ 64 Here, the record contains sufficient reasonable evidence to allow Mendoza to pursue punitive damages from McDonald's. For example, after being warned by Dr. Roesener in 1997 that delay in treat-

---

31. McDonald's argues it was entitled to support its defense that it acted reasonably by introducing evidence that "suggested" Mendoza may not have been injured at McDonald's and her injury had not caused carpal and radial tunnel syndromes or ongoing psychological and physical pain. McDonald's argument is not supported by this record. McDonald's used this evidence at trial to suggest to the jury Mendoza had obtained workers' compensation benefits by hiding her prior medical history from her doctors, McDonald's and its doctors, and the ICA administrative law judges. Putting aside the ample evidence, not challenged by McDonald's, that McDonald's had access to Mendoza's medical history beginning in May 1998, *see supra* ¶ 26, if, as McDonald's argues, it knew nothing

about Mendoza's medical history when it was administering her workers' compensation claim, then we fail to understand how what it did not know about Mendoza could demonstrate it acted reasonably. The reasonableness of an insurer's actions in handling a claim must be evaluated as of the time of those actions based on what it knew when it acted. *See Zilisch*, 196 Ariz. at 237–38, ¶¶ 20–21, 995 P.2d at 279–80.

32. Given our resolution of the preclusion issue, we need not address Mendoza's argument the court should have instructed the jury that in handling a workers' compensation claim, an employer and its carrier take the employee "as is."

ing Mendoza's carpal tunnel condition could lead to permanent injury, McDonald's consciously waited many months before approving carpal tunnel surgery. Although it was entitled to seek an independent medical examination regarding Mendoza's need for treatment, McDonald's terminated Mendoza's temporary total disability benefits even though it did not know whether it actually had light-duty work available for Mendoza. McDonald's then took the position Mendoza had not timely protested its denial of carpal tunnel surgery—a position that was completely without merit. Although by May 1998 McDonald's had been advised Mendoza's carpal tunnel condition was causally related to the accident, it scheduled another independent medical examination with a different doctor. It did this, according to its claim file, to "support our denial." From this evidence, a jury could conclude McDonald's had engaged in impermissible "doctor shopping" in conscious disregard of the likely deterioration in Mendoza's medical condition.

¶ 65 After finally accepting Mendoza's carpal tunnel condition as being work related, McDonald's insisted on conservative care rather than surgery, even though Mendoza had been suffering from carpal tunnel symptoms for many months and her treating physician, Dr. Roesener, had advised McDonald's in October 1997 that without surgery Mendoza could experience permanent dysfunction. Then, after the physician it had selected, Dr. Joseph, recommended surgery, it insisted that such surgery be performed endoscopically. Although we recognize McDonald's apparently relied on Dr. Joseph's recommendation in insisting on an endoscopic procedure, it then never responded to Mendoza when she offered to undergo endoscopic or classical carpal tunnel surgery and to be treated by any qualified surgeon with the exception of Dr. Joseph because she believed he would be a material witness in this lawsuit.

¶ 66 McDonald's claim file reflects it sought independent medical examinations for the purpose of "cutting" or closing Mendoza's claim. Although McDonald's workers' compensation expert witness testified references to cutting or closing claims were simply "jargon," and referred to acceptable goals of processing workers' compensation claims, a jury could certainly conclude otherwise.

¶ 67 Finally, although McDonald's knew, from the inception of the claim, Mendoza spoke Spanish and needed an interpreter, McDonald's terminated all benefits when Dr. Guidera notified it he had been unable to complete his examination of her because she could not understand English. McDonald's then failed to properly investigate the appropriateness of its termination of benefits based on Mendoza's inability to understand English. Mendoza's workers' compensation expert testified that even if the initial termination of benefits had been a mistake, McDonald's should have reinstated benefits no later than November 3, 2003, when it advised the ICA that it was rescheduling the examination with an interpreter present. But McDonald's did not reinstate benefits until March 2004.

¶ 68 Although we recognize McDonald's views the facts in this case very differently from Mendoza and does not believe the circumstances subject it to punitive damages, we conclude the issue of punitive damages is for the jury to consider.

## CONCLUSION

¶ 69 For the foregoing reasons, we affirm the jury's verdict in favor of Mendoza and against McDonald's on her claim for breach of the duty of good faith and fair dealing; we also affirm that part of the judgment awarding Mendoza court costs in the sum of $53,937.24. We vacate the remainder of the judgment and remand for a new trial on compensatory and punitive damages[33] in accordance with this opinion.[34] Further, as the

---

33. Because we are remanding for a new trial on compensatory and punitive damages, we need not address the other issues raised by Mendoza on appeal.

34. Although Mendoza requested a new trial for a redetermination of compensatory and punitive

damages, McDonald's has not argued on appeal it is entitled to a redetermination of liability. Therefore, the new trial on remand shall be limited to the issues of compensatory and punitive damages.

successful party in this appeal, we award Mendoza her costs on appeal pursuant to A.R.S. § 12–341 (2003) upon her compliance with Arizona Rule of Civil Appellate Procedure 21.

CONCURRING: DIANE M. JOHNSEN, Presiding Judge, and LAWRENCE F. WINTHROP, Judge.